KANAWHA GAS & UTILITIES CO.

v.

COMMISSIONER OF INTERNAL REVENUE.

No. 14719.

United States Court of Appeals Fifth Circuit.

July 21, 1954.

Maurice P. Wolk, Ellis N. Slack, George F. Lynch, Sp. Assts. to Atty. Gen., H. Brian Holland, Asst. Atty. Gen., Kenneth W. Gemmill, Acting Chief Counsel Internal Revenue Bureau, Claude R. Marshall, Sp. Atty., Washington, D. C., for respondent.

Adrian W. DeWind, New York City (Eugene H. Lattin, New York City, James B. Lewis, New York City, of counsel), for Textron Incorporated as amicus curiae.

Before HUTCHESON, Chief Judge, RIVES, Circuit Judge, and DAWKINS, District Judge.

RIVES, Circuit Judge.

The petitioner seeks review of a decision of the Tax Court reported at 19 T.C. 1017 involving deficiencies in income tax for the year 1943. The issues relate to the basis to be used in computing profit on the sale of natural gas wells acquired by the purchase of the stock of eight corporations in 1929.

We quote the Tax Court's "Findings of Fact":

"The petitioner is a West Virginia corporation with an office at Birmingham, Alabama. Its income and declared value excess profits tax return for the calendar year 1943 was filed with the collector of internal revenue for the district of Alabama. It reports its income and files its returns on a calendar year basis and on the accrual method of accounting. It was organized on June 24, 1929.

"Anderson Development Company, herein sometimes called Anderson, was a corporation organized on February 3, 1928, at the instance of one Rummel who thereafter controlled it. In 1928 or early 1929 Rummel became interested in the purchase and sale of gas producing properties in Lincoln County, West Virginia. Rummel attempted to have Anderson acquire gas leaseholds then owned by eight corporations and 132 gas wells thereon. The corporations refused to sell

William Bew White, Jr., Bernard A. Monaghan and J. O. Screven, Jr., William B. White, Birmingham, Ala. (White, Bradley, Arant, All & Rose, Birmingham, Ala.. of counsel), for petitioner.

their physical properties because of doubts as to the tax consequences. As the result of ensuing negotiations, Anderson entered into contracts dated June 1, 1929 for the purchase of all of the outstanding stock of six of the eight corporations.[1] On the same date, Anderson entered into agreements to purchase leases and leasehold interests owned by several individuals and partnerships and which included 62 gas wells.[2]

"A typical agreement for the purchase of stock was the one between Anderson and the stockholders of Ray Gas Company which provided in material part as follows:

"The purchaser (Anderson) agrees to pay for all of said capital stock of the Ray Gas Company, the sum of Sixty Thousand Dollars ($60,000) * * *.

"Provisions were made for installment payments one of which was due on or before September 1, 1929, and the final payment on or before December 11, 1929. There were provisions for title search and the retention by Ray Gas Company of possession of and the operation of its properties until the installment due on September 1, 1929, was paid. At that time, full possession and control were to pass to the purchaser.

"On the same date, June 1, 1929, the stockholders of Laurel Development Company gave a written option to Anderson to purchase all of their stock for the sum of $299,000. The option was to run until August 1, 1929. All money of Laurel on hand at August 1, 1929, and proceeds from gas sales prior to that date were to be the property of the stockholders, and they were liable for taxes up to that date. Income and taxes thereafter were to be those of Anderson.

"On June 3, 1929, and thereafter throughout 1929, North American Water Works & Electric Corporation (herein referred to as 'North American') was a subsidiary corporation of Atlantic Public Utilities Corporation. North American was a holding company holding stock in corporations that were engaged in the business of operating and developing electric, gas and water properties. Chase and Gilbert, Inc., a Boston investment firm, controlled, operated and managed Atlantic Public Utilities throughout the year 1929.

"On June 3, 1929, Anderson and North American entered into a written agreement whereby Anderson agreed to sell to North American the stocks of the several corporations, and the leases and leasehold estates, that it had agreed to purchase. The agreed price for the stocks and leasehold interest was $1,300,000, of which $100,000 was to be deposited by June 5, 1929, $300,000 on or before August 1, 1929, $450,000 on or before September 1, 1929, and $450,000 on or before December 1, 1929.

"The petitioner was organized on June 24, 1929, as an affiliate of the North American and Atlantic Public Utilities group. On July 3, 1929 North American assigned to the petitioner its agreement with Anderson for the purchase of stocks of the several corporations and leases and leasehold interests. In addition to the corporate stocks above mentioned, Anderson elected to deliver to the petitioner the stock of Maul Rock Gas Company. All of the terms and conditions of the contract between Anderson and North Amer-

1. "The six corporations were: Bear Branch Gas Company, Union Oil & Gas Company, Ray Gas Company, West Side Gas Company, Foote Oil & Gas Company, and McClure Gas Company.

2. "Such individuals and partnerships were: Jaynes & Wysong, G. T. Ray & Son, C. C. Wolfe, W. H. McClung, Linkous and Young, Ray & Osburne, Linkous and McClung, Ray, Ray and Black, and A. F. Morris, Agent.

ican dated June 3, 1929, were performed by Anderson, seller, and by North American and by the petitioner, as assignee of North American, purchaser, respectively. Anderson received, in the aggregate, for all the interests and stocks transferred to the petitioner the full $1,300,000 agreed upon between it and North American.

"In the early part of 1929, Chase & Gilbert, Inc., employed a consulting engineer and geologist to examine the 194 operating gas properties that were owned by the corporations and others above mentioned. He was employed to investigate the gas reserves and to make a recommendation to Chase & Gilbert, Inc., as to whether or not to purchase the stocks and properties. The desire of Chase & Gilbert, Inc., was to purchase producing properties. Because of the scattered ownership, through corporations, individuals and partnerships, Chase & Gilbert's representative deemed it advisable to purchase the stocks of those corporations that owned producing gas properties.

"The result of the foregoing transactions was that the petitioner in 1929 acquired the stocks of eight corporations which owned 132 natural gas wells, and properties used in connection therewith, and 62 natural gas wells and properties used in connection therewith, all of which at June 3, 1929, and prior thereto, had been owned and operated by others than the petitioner.

"On July 31, 1929, certificates evidencing all of the capital stock of Laurel Development Company, duly endorsed, were delivered to or for the account of the petitioner. On December 28, 1929, certificates for all of the shares of Laurel were issued to nominees of the petitioner.

"On December 2, 1929, the petitioner made payment of the final installment of the purchase price of the stocks of the seven corporations

above named, other than Laurel Development Company, and the escrow agents surrendered to the petitioner certificates, duly endorsed in blank, for all of the issued and outstanding stock of the seven corporations. On the same date the resignations of all officers and directors of the seven corporations, previously deposited in escrow, were accepted, and new officers and directors who were nominees of the petitioner were elected.

"On December 19, 1929, all of the eight corporations above named, whose stocks had been acquired by the petitioner, adopted resolutions to transfer to the petitioner all of their oil and gas leases and all contracts and equipment appertaining to them. Pursuant to such resolutions, deeds of assignment to those properties were executed and recorded in accordance with the law of West Virginia.

"Of the above eight corporations whose stocks were acquired by the petitioner, all but Laurel Development Company were dissolved on or about June 25, 1930. Laurel Development Company was dissolved on or about March 18, 1938.

"As of the effective dates of the sales of stocks of the eight corporations (June 1, 1929 in the case of seven, and August 1, 1929 as to Laurel Development Company), all assets of those corporations except operating assets had been distributed to their stockholders. As of the effective sales dates, the properties were operated for the benefit of North American and/or the petitioner. After those dates no entries were made on the books of the eight vendor corporations with the possible exception of a minor entry on the books of Laurel Development Company.

"For the year 1929, Atlantic Public Utilities, Inc., and North American Water Works and Electric Corp. and/or their affiliated companies filed a consolidated tax return. In-

cluded therein was a 'Statement of Profit and Loss', reporting gross income and deductions from gross income for 'Kanawha Gas & Utilities Company and Subsidiaries (6/1 to 12/31/29).' For the period from June 1, 1929, to December 31, 1929, petitioner, Bear Branch Gas Company, Union Oil & Gas Company, Ray Gas Company, West Side Gas Company, Foote Oil & Gas Company, McClure Gas Company, Maul Rock Gas Company, and for the period from August 1, 1929, to December 31, 1929, Laurel Development Company each filed an 'Authorization and Consent of Subsidiary Corporation Included in a Consolidated Income Tax Return and Return of Information', Form 1122, authorizing the parent corporations to make a consolidated return on its behalf and consenting to and agreeing to be bound by the provisions of Treasury Regulations 75 prescribed prior to the making of the consolidated return.

"In 1941, 1942 and 1943, the petitioner sold some of the gas properties that it had acquired in 1929."

The Tax Court concluded that:

"The petitioner's unadjusted basis in 1941, 1942 and 1943 with respect to the 132 gas properties that it acquired from the eight corporations in 1929 was the same as it was in the hands of those corporations."

The Tax Court failed to find explicitly that the stocks of the eight corporate vendors were acquired by North American and petitioner as steps in a plan to acquire the 132 operating gas properties owned by those corporations; but its findings and opinion impliedly concede that to have been the case, and the evidence is clearly to that effect.

Two principal questions are presented for decision: (1) Whether the eight ven-

dor corporations had any income or expense or engaged in any business activities after the acquisition of their stocks by petitioner, and whether they were in fact members of the affiliated group which filed the consolidated return for 1929; (2) Assuming that the eight corporations were members of the affiliated group, whether, for the purpose of computing profit on the sale of certain natural gas wells in 1943, petitioner is limited to the basis of those properties in the hands of the eight corporations from which they were acquired.

■ (1) Legal title to the physical properties remained in the eight corporations until December 19, 1929, when petitioner became the unqualified owner of such assets. North American, petitioner's parent, actually entered into possession of the assets of the corporate vendors on June 1, 1929, and turned such possession over to petitioner after its organization on June 24, 1929, except in the case of Laurel Development Company, and petitioner entered into possession of the properties of that company on August 1, 1929. All receipts from and all expenses of operating the properties after such dates became those of the petitioner and were so treated on its records. Under the contracts, the eight corporate vendors had no income and expense after North American and petitioner took possession of their assets. Hence, in our opinion, they were not in any real sense subsidiaries of petitioner, or affiliated with the Atlantic and North American consolidated group.

■ (2) If, however, we assume that the eight corporations were properly included as subsidiaries of the petitioner in the 1929 consolidated return, it does not follow that petitioner is limited to the basis of those properties in the hands of the corporations from which they were acquired. The Tax Court referred to Section 141 of the Revenue Act of 1928.[3]

---

3. Revenue Act of 1928, c. 852, 45 Stat. 791, § 141, 26 U.S.C.A.Int.Rev.Acts, page 396:

"§ 141. *Consolidated Returns of Cor-*

*porations—1929 and Subsequent Taxable Years*

"(a) *Privilege to File Consolidated Returns.* An affiliated group of corpora-

Articles 37 and 38 of Regulations 75 [4] applicable to the taxable year 1929 and subsequent years, and Internal Revenue Code Section 113(a) (11),[5] and held that the

tions shall, subject to the provisions of this section, have the privilege of making a consolidated return for the taxable year 1929 or any subsequent taxable year, in lieu of separate returns. The making of a consolidated return shall be upon the condition that all the corporations which have been members of the affiliated group at any time during the taxable year for which the return is made consent to all the regulations under subsection (b) prescribed prior to the making of such return; and the making of a consolidated return shall be considered as such consent. In the case of a corporation which is a member of the affiliated group for a fractional part of the year the consolidated return shall include the income of such corporation for such part of the year as it is a member of the affiliated group.

"(b) *Regulations.* The Commissioner, with the approval of the Secretary, shall prescribe such regulations as he may deem necessary in order that the tax liability of an affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be determined, computed, assessed, collected, and adjusted in such manner as clearly to reflect the income and to prevent avoidance of tax liability."

4. Treasury Regulations 75, promulgated under the Internal Revenue Code:
"*Application of Regulations*
"(a) *1929 and Subsequent Years.*
"These regulations are applicable only to the taxable year 1929 and to subsequent taxable years.
\* \* \* \* \*
"ART. 37. *Dissolutions—Recognition of Gain or Loss.*
"(a) *During Consolidated Return Period.*
"Gain or loss shall not be recognized upon a distribution during a consolidated return period, by a member of an affiliated group to another member of such group, in cancellation or redemption of all or any portion of its stock; and any such distribution shall be considered an intercompany transaction.
\* \* \* \* \*
"ART. 38. *Basis of Property.*
"(a) *General Rule.*
"Subject to the provisions of paragraph (b), the basis during a consolidated return period for determining the gain or loss from the sale or other disposition of property, or upon which exhaustion,

wear and tear, obsolescence, and depletion are to be allowed, shall be determined and adjusted in the same manner as if the corporations were not affiliated (see sections 111 to 115, inclusive, of the Act), whether such property was acquired before or during a consolidated return period. Such basis immediately after a consolidated return period (whether the affiliation has been broken or whether the privilege to file a consolidated return is not exercised) shall be the same as immediately prior to close of such period.
"(b) *Intercompany Transactions.*
"The basis prescribed in paragraph (a) shall not be affected by reason of a transfer during a consolidated return period (whether by sale, gift, dividend, upon dissolution, or otherwise) from a member of the affiliated group to another member of such group.
"(c) *Basis not Affected by Acquisition or Sale of Stock.*
"Neither the acquisition of stock of a corporation or its sale or other disposition shall affect the basis of the property of such corporation for determining gain or loss or upon which exhaustion, wear and tear, obsolescence, and depletion are to be allowed."

5. Internal Revenue Code:
"§ 113. *Adjusted basis for determining gain or loss—*
"(a) *Basis (unadjusted) of property.* The basis of property shall be the cost of such property; except that—
\* \* \* \* \*
"(11) *Property acquired during affiliation.* In the case of property acquired by a corporation, during a period of affiliation, from a corporation with which it was affiliated, the basis of such property, after such period of affiliation, shall be determined, in accordance with regulations prescribed by the Commissioner with the approval of the Secretary, without regard to inter-company transactions in respect of which gain or loss was not recognized. For the purposes of this paragraph, the term 'period of affiliation' means the period during which such corporations were affiliated (determined in accordance with the law applicable thereto) but does not include any taxable year beginning on or after January 1, 1922, unless a consolidated return was made, nor any taxable year after the taxable year 1928. The basis in case of property acquired by a corporation during any period, in the taxable year 1929 or any subsequent taxable

petitioner is so limited. Concededly, that would be the correct result if petitioner acquired the stocks of the eight corporate vendors intending to assume and, for so long as conditions warranted, to maintain the relation of parent to subsidiaries. Actually, however, petitioner acquired those stocks solely as a means of acquiring their physical properties, intending throughout to cause the corporate vendors to distribute their assets in liquidation to petitioner as soon as it acquired legal title to the stocks; and petitioner promptly executed that plan in accordance with its terms. In the words of the witness Smith, who acted in 1929 as the engineer and attorney-in-fact for Chase & Gilbert, Inc., "We were buying properties. That was the whole import and tenor of all the negotiations. The stock was purely coincidental."

In determining the incidence of taxation, we must look through form and search out the substance of a transaction. Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 333, 65 S.Ct. 707, 89 L.Ed. 981; Gregory v. Helvering, 293 U.S. 465, 470, 55 S.Ct. 266, 79 L.Ed. 596. This basic concept of tax law is particularly pertinent to cases involving a series of transactions designed and executed as parts of a unitary plan to achieve an intended result. Such plans will be viewed as a whole regardless of whether the effect of so doing is imposition of or relief from taxation. The series of closely related steps in such a plan are merely the means by which to carry out the plan and will not be separated.[6] That rule has recently been applied by this Court in a case involving assets acquired by a corporation upon the dissolution of a wholly owned subsidiary. Kimbell-Diamond Milling Co. v. Commissioner, supra, Note 6. As the Tax Court pointed out in its decision, the case most nearly like the present one on its facts is Commissioner of Internal Revenue v. Ashland Oil & Refining Co., supra, Note 6. The Tax Court said, however, that:

"For the year in suit in the Ashland case, whatever regulations there were as to the filing of consolidated returns did not have the statutory sanction that was given to them by section 141 of the Revenue Act of 1928. It may be that for that reason the Court felt it proper to disregard intervening steps. At any rate, we think that the absence of legislation on the subject in 1926 is an effective distinction between the Ashland case and the one before us."

We think that there is no sound ground for that distinction. The regulation can be no more certainly applicable than an Act of Congress,[7] and even an

year, in respect of which a consolidated return is made by such corporation under section 141 * * * the Revenue Act of 1928 * * * shall be determined in accordance with regulations prescribed under section 141(b) of * * * the Revenue Act of 1928 * * *." 26 U.S. C.A. § 113(a) (11).

6. See Kimbell-Diamond Milling Co. v. Commissioner, 5 Cir., 187 F.2d 718; S. Klein on the Square, Inc. v. Commissioner, 2 Cir., 188 F.2d 127; Commissioner of Internal Revenue v. Ashland Oil & Refining Co., 6 Cir., 99 F.2d 588; Helvering v. Elkhorn Coal Co., 4 Cir., 95 F.2d 732; Helvering v. Security Savings & Commercial Bank, 4 Cir., 72 F.2d 874; Ahles Realty Corp. v. Commissioner, 2 Cir., 71 F.2d 150; Prairie Oil & Gas Co. v. Motter, 10 Cir., 66 F.2d 309; Tulsa Tribune Co. v. Commissioner, 10 Cir., 58 F.2d

937; Paul, "Selected Studies in Federal Taxation", Second Series, pp. 250 to 254.

7. Granting the broad power extended to the Commission under section 141(b) of the Revenue Act of 1928 to prescribe regulations, that power is not unlimited. The Commissioner is empowered to prescribe regulations in order that "the tax liability of an affiliated group of corporations * * * may be determined, computed, assessed, collected, and adjusted in such manner as clearly to reflect the income and to prevent avoidance of tax liability." The Report of the Senate Committee on Finance on the Revenue Act of 1928 pointed out that "the standard prescribed by the section keeps the delegation from being a delegation of pure legislative power." S.Rep. 960, 70th Cong., 1st Sess. pp. 13–15. A regulation which attempted to invalidate a

Act is given effect with regard to the substance rather than the form of a transaction. To determine what basis provision applies, we must first ascertain the true nature of the transaction. Looking upon this transaction as a whole, it was simply the purchase of the operating gas properties of the eight corporations by whatever means accomplished, and hence petitioner's basis is the cost to it of such properties. The decision of the Tax Court is therefore

Reversed.

basic concept of tax law itself designed clearly to reflect the tax consequences of a transaction is hardly within the scope of the Commissioner's authorization. See Corner Broadway-Maiden Lane v. Commissioner, 2 Cir., 76 F.2d 106, where it was held that regulations promulgated under section 141 of the Revenue Act of 1928 "must be limited to regulations not inconsistent with the statute or otherwise invalid." 76 F.2d 108.