[No. B056571. Second Dist., Div. Seven. Dec. 24, 1991.]

SHUWA INVESTMENTS CORPORATION, Plaintiff and Appellant, v. COUNTY OF LOS ANGELES, Defendant and Respondent.

1636

**COUNSEL**

O'Melveny & Myers, Frederick A. Richman, Thomas M. McCoy, Marcy Jo Mandel, Kindel & Anderson, Carlos Solis and Gary W. Maeder for Plaintiff and Appellant.

De Witt W. Clinton, County Counsel, Dennis M. Devitt and Albert Ramseyer, Deputy County Counsel, Nossaman, Guthner, Knox & Elliott, Alvin S. Kaufer and Jean F. Spitzer for Defendant and Respondent.

**OPINION**

**JOHNSON, J.**—Appellant, Shuwa Investments Corporation (Shuwa), appeals from a summary judgment in favor of defendant and respondent County of Los Angeles (County), denying its claim for partial refund of property taxes. The ultimate issue in this appeal is whether Shuwa's acquisition of the ARCO Plaza office building complex in downtown Los Angeles resulted in a 50 percent "change of ownership" as Shuwa contends, or in a 100 percent "change of ownership" as the County contends. We agree with the County that Shuwa's acquisition resulted in a 100 percent "change of ownership" and affirm the judgment.

FACTS AND PROCEEDINGS BELOW

Prior to September 16, 1986, the Flower Street partnership owned the ARCO Plaza. Flower Street Limited, a California general partnership, had two general partners: Atlantic Richfield Company (ARCO) and Bank of America. Each owned a 50 percent partnership interest in Flower Street.

In 1985, ARCO decided to sell the interest it held in the ARCO Plaza through Flower Street. An ARCO/Bank of America working group formed to dispose of the ARCO Plaza. This group prepared hypothetical legal documents in preparation for the sale. The parties prepared the documents, expecting it would require several buyers to purchase the respective partnership interests.

On July 23, 1986, Shuwa submitted a letter of intent offering to buy 100 percent of the ARCO Plaza from Flower Street. Shuwa's offer was rejected. ARCO explained that because of the unfavorable federal income tax consequences of such a sale, purchase by Shuwa of ARCO's partnership interest was the only way ARCO would agree to participate in the transaction.[1]

On July 25, 1986, Shuwa, ARCO and Bank of America executed a letter of intent for Shuwa to purchase "all of the partnership interests."[2] The letter of intent also indicated the parties' desire to structure the transaction to minimize the "change in ownership" for property tax purposes.[3] Counsel for Shuwa testified it was assumed the terms of the letter agreement were not binding and that both the economic terms and structure of the transaction would be further negotiated prior to closing of the transaction. Counsel also testified he advised Shuwa not to purchase any more partnership interests than were necessary to consummate the transaction in order to limit partnership liability exposure.

The parties arrived at a structure for the transaction which satisfied ARCO's federal income tax requirements, Shuwa's opposition to the purchase of more partnership interests than were necessary and the parties'

---

[1]According to appellant, losses incurred by ARCO in 1985 from the disposition of other assets subjected the gain on the sale of ARCO Plaza to the ordinary income tax rate of 47 percent under Internal Revenue Code section 1231. If ARCO instead sold its 50 percent partnership interest in Flower Street, the gain applicable to ARCO's profit on the sale of its partnership interest would be taxed at the capital gain rate of 28 percent. The additional federal income tax cost to ARCO from a sale of the ARCO Plaza by Flower Street, as opposed to a sale by ARCO of its partnership interest in Flower Street, would have been over $36 million.

[2]The introductory paragraph of the letter of intent states:

"This letter constitutes an offer by the undersigned Shuwa Investments Corporation (the 'Buyer') to purchase from the owners thereof *all of the partnership interests* (the 'interests') in Flower Street Limited, a California general partnership (the 'partnership'), 50 percent from Atlantic Richfield Company ('ARCO') and 50% from Bank of America N.T. & S.A. ('Bank')." (Italics added.)

[3]Paragraph 14 of the letter of intent described the proposed structure of the transaction:

"The parties desire to structure the transaction provided for herein such that there is no 'change in ownership' of the Property for property tax purposes, or to minimize the extent of any such change in ownership, and shall reasonably consider provisions to achieve such result in the documentation of these transactions (including but not limited to the Purchase Agreement, the ARCO and Bank Office Space Leases, and conveyancing instruments)."

desire to minimize any property tax reassessment. The proposed structure was a three-step transaction in which 1) ARCO would sell its partnership interest in Flower Street to Shuwa; 2) Bank of America and Shuwa would liquidate Flower Street and receive their respective 50 percent undivided interests in ARCO Plaza; and 3) Bank of America would sell its 50 percent undivided interest in the ARCO Plaza to Shuwa.

Section 12.14 was added to the draft purchase and sale agreement to reflect the contemplated three-step structure.[4] This structure had been informally reviewed by the State Board of Equalization's chief counsel for property taxes who opined the transaction would result in a 50 percent "change in ownership."

On August 4, 1986, the parties signed a purchase and sale agreement providing for a sale of all the partnership interests agreeing to use their best efforts to structure the transaction through this three-step process.

On August 6, 1986, the parties sought a formal opinion from the State Board of Equalization regarding the tax consequences of the transaction to confirm there would be a change in ownership for property tax purposes of 50 percent of the property. On September 2, 1986, tax counsel for the State Board of Equalization issued an advisory opinion which concluded that, assuming the steps were necessitated by bona fide business purposes, independent of a desire to avoid property tax, the transaction would result in only a 50 percent change in ownership for reassessment purposes.[5]

---

[4]Section 12.14 provided: "The parties acknowledge that Seller has applied or will apply for a ruling from the California State Board of Equalization (The 'Board') with respect to the property tax consequences of structuring this transaction as a transfer by Atlantic Richfield of all (or substantially all) of its Partnership Interest to Buyer, a liquidation of the Partnership by Buyer and Bank (and Atlantic Richfield if it has retained any part of its Partnership Interest), and a transfer by Bank (and Atlantic Richfield, if applicable) to Buyer of its undivided interest in the Property (on the same basis as provided for herein). In the event that the Board issues a favorable ruling, the parties agree to use their best efforts to effectuate the transaction in the manner approved by the Board which will minimize any adverse property tax consequences resulting from this transaction."

[5]The opinion from tax counsel for the State Board of Equalization was based on the hypothetical prepared by counsel for Shuwa, ARCO and Bank of America. The board's response was as follows:

"Your letter to Mr. Richard Ochsner dated August 6, 1986 requests our opinion regarding the property tax consequences of the following transaction:

"P is a California general partnership with two equal partners—A and B—which owns improved real property acquired or constructed prior to March 1, 1975. [X], an unrelated party, desires to acquire title to the property. Partner A is unwilling, however, to have the partnership sell the property to X, because a sale of the property by the partnership (or by A) would generate substantial adverse federal income tax consequences to A. Partner A is

On September 3, 1986, the agreement was amended to adopt the three-step procedure.[6] Other changes to the purchase agreement included a reduction in purchase price and a modification to ARCO's lease.[7]

On September 15, 1986, the parties delivered to escrow all documents required to consummate the transaction with instructions the documents were not to be effective until the closing on September 16, 1986. On

wiling [*sic*] to participate in a transaction in which Partner A sells all or substantially all of its partnership interest to X. On the other hand, X desires to obtain title to the property and does not wish to have the property held in the name of the partnership.

"In order to accommodate the interests of all of the parties, the following structure has been proposed: Partner A will sell its 50 percent interest in P to X. Partners B and X will thereafter dissolve the partnership, wind up its affairs and distribute the property to B and X pro-rata. B will thereafter transfer its 50 percent interest in the property to X.

"You have asked for our confirmation that the property tax consequences of the above transaction are as follows: Under Section 64(a), the transfer by Partner A of its 50 percent interest in the partnership is not a change in ownership of the property owned by the partnership, since neither Section 46(c) nor Section 64(d) is applicable. The distribution by the partnership of the property to B and X is not a change in ownership under Section 62(a)(2). The transfer by B of its 50 percent interest in the property to X is a change of ownership of the property transferred by B—i.e., the 50 percent interest in the property.

"In our opinion, the transaction described above raises the issue of the applicability for property tax purposes of the step transaction, business purpose and substance over form doctrines developed by the federal courts. Whether one or more of these judicial doctrines applies in this case depends in our view, on whether there is an independent business purpose for the sale by Partner A of his 50 percent partnership interest to X other than avoidance of property taxes. If not, we believe the transaction should in substance be treated either as a sale of the real property from the partnership to X or as a sale of the real property from A and B to X. In either case, there would be a 100 percent change in ownership.

"If, on the other hand, an independent business purpose does exist for Partner A's sale of his partnership interest to X other than avoidance of property taxes (we express no opinion whether such business purpose exists) then we agree that the property tax consequences are as set forth above, i.e., a change in ownership of only the 50 percent interest in the real property transferred by B.

"The views expressed in this letter are, of course, advisory only and are not binding upon the assessor of any county. You may wish to consult the appropriate assessor in order to confirm that the described property will be assessed in a manner consistent with the conclusion stated above."

[6]Section 14 was added to the agreement to modify section 12.14 regarding the three-step structure of the transaction:

"The second sentence of Section 12.14 of the Agreement is hereby deleted in its entirety. At the request of any party prior to Closing, the parties shall use best efforts to structure the transactions provided for in the Agreement, and hereby amended, in the manner described in such amended Section 12.14."

[7]The purchase and sale agreement retained the language reflecting the parties' intent to sell the partnership interests:

"A. The Bank and Atlantic Richfield each hold fifty percent (50 percent) of the partnership interests in Flower Street Limited, a California general partnership (The 'Partnership').

". . . . . . . . . . . . . . . . . . . . . . . . . .

September 16, 1986, escrow closed and Shuwa acquired title to the ARCO Plaza through the previously described three-step process. Shuwa paid Bank of America and ARCO a total of $620 million.

The county assessor reassessed the ARCO Plaza 100 percent on the basis of 100 percent "change of ownership." For the 1986-1987 tax year, supplemental property taxes were levied in the amount of $3,248,182.74 based on the increase in the assessed value. For the 1987-1988 tax year, property taxes were levied in the amount of $6,679,149.45 based on the new assessed value. ██ ██ Shuwa paid these taxes and filed appeals before the County Assessment Appeals Board claiming a partial refund based on 50 percent change in ownership.[8]

After Shuwa's appeals were denied, Shuwa filed a complaint for refund of property taxes alleging neither the transfer of ARCO's partnership interest nor Flower Street's pro rata distribution of the ARCO Plaza was a "change

"C. Buyer desires to purchase from Bank and Atlantic Richfield and Bank and Atlantic Richfield desire to assign and sell to Buyer all of their respective partnership interests in the Partnership upon the terms and conditions set forth herein."

Shuwa contends severe time constraints prevented redrafting the purchase agreement to reflect only the three-step structure. At oral argument Shuwa explained Bank of America wanted the sale consummated in time to have its upcoming quarterly report reflect the proceeds from sale of the ARCO Plaza in order to improve its financial position.

[8]The assessment appeals board denied Shuwa's appeals finding:

"The partnership agreement (Article XVI) prohibited the sale of any interest without consent of the other party. By [Bank] consenting to the transfer of ARCO's interest at the request of ARCO and Shuwa, Shuwa effectively controlled the partnership and the transaction. This effective control requires reassessment of 100 percent of the property.

"It was the intention of Shuwa to purchase 100 percent of the property and to obtain title in its own name in one continuous process.

"A change of ownership pursuant to California Constitution Article XIII A, occurred upon Shuwa obtaining 100 percent of the property in its own name.

"Steps taken for tax purposes are to be ignored if it would unfairly prevent 100 percent reassessment upon a sale made in one continuous process and with clear intent to obtain 100 percent title.

"Deliberate use of the procedure utilized here could prevent reassessment of 50 percent transfers of all property sold by corporations and partnerships in California."

The County in essence concedes the reasoning of the appeals board was erroneous. The ruling adopted a test of "effective control" for the partnership in this case and ignored the legislative definition of "control" in a partnership to be a "majority ownership interest." (Rev. & Tax. Code, § 64, subd. (c).) For the same reason we must reject the County's argument Shuwa had "control" because, in addition to its 50 percent interest it acquired from ARCO, it had a contract right to enforce the sale of the Bank's 50 percent interest. The concept of a chose in action representing indirect, constructive or "effective" control in construing the Revenue and Taxation Code has already been discredited by the courts in favor of the statutory definition. (See *Sav-On Drugs, Inc.* v. *County of Orange* (1987) 190 Cal.App.3d 1611, 1621 [236 Cal.Rptr. 100], cited with approval in *Title Ins. & Trust Co.* v. *County of Riverside* (1989) 48 Cal.3d 84 [255 Cal.Rptr. 670, 767 P.2d 1148].)

in ownership" under the Revenue and Taxation Code. Shuwa's complaint further alleged Bank of America's transfer of its undivided interest in the ARCO Plaza was a "change of ownership" only as to the 50 percent interest transferred and the 100 percent reassessment was therefore erroneous.

In its answer, the County denied 100 percent reassessment of the ARCO Plaza was erroneous, alleging, inter alia, each of the three transfers was a step in a larger transaction, that Shuwa owned 100 percent of ARCO Plaza when it owned no interest in the property the day before, and that Shuwa's complaint was barred by the step transaction, business purpose, and substance over form doctrines.

Proceedings before the trial court were de novo. The County moved for summary judgment following completion of discovery. Shuwa filed opposition and its own motion for summary judgment. The trial court granted the County's motion based on its findings "the purpose of the transactions was to avoid property taxes" and that "there was a complete change in ownership". At the conclusion of the hearings on the County's motion, the trial court stated: "Just so there is clarity in the future of this case, I make the following two findings as a matter of law: One, that the purpose of the transactions was to avoid property taxes. Number two, I find that there was a complete change of ownership. [¶] The motion for summary judgment is granted."

Shuwa appeals from the summary judgment entered in the County's favor.

## DISCUSSION

What constitutes a "change in ownership" is a question of law subject to this court's independent de novo judicial review. (*Pacific Grove-Asilomar Operating Corp.* v. *County of Monterey* (1974) 43 Cal.App.3d 675, 680-683 [117 Cal.Rptr. 874].) We are, therefore, not bound by the trial court's conclusions. (*Stratton* v. *First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1083 [258 Cal.Rptr. 721].) (3) "Since a summary judgment motion raises only questions of law regarding the construction and effect of the supporting and opposing papers, we independently review them on appeal . . . ." (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].) This court must independently identify the issues framed by the pleadings, determine whether the moving party has made a prima facie showing sufficient to justify a judgment, and determine whether the opposition demonstrates the existence of a triable issue of material fact. (*Id.* at pp. 1064-1065.) In so doing, we strictly construe the moving papers and liberally construe the opposing papers.

Because summary judgment is such a drastic measure, all doubts concerning the propriety of granting the motion must be resolved in favor of its denial. (*Stratton* v. *First Nat. Life Ins. Co.*, *supra*, 210 Cal.App.3d 1071.)

I. THE TRANSFERS TECHNICALLY COMPLIED WITH THE LETTER IF NOT THE SPIRIT OF THE REVENUE AND TAXATION CODE.

Article XIII A of the California Constitution (Proposition 13) provides that real property shall be reassessed for property tax purposes when a "change in ownership" occurs or the property is "newly constructed" or "purchased." (Cal. Const., art. XIII A, § 2, subd. (a); Rev. & Tax. Code, §§ 60 et seq., 70 et seq.; Cal. Code Regs., tit. 18, § 463.) The Supreme Court in *Amador Valley Joint Union High School Dist.* v. *State Board of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281], determined the meaning of "change of ownership" was left for resolution "by the contemporaneous construction of the Legislature or of the administrative agencies charged with implementing the new enactment." (Accord, *Title Ins. & Trust Co.* v. *County of Riverside*, *supra*, 48 Cal.3d 84, 95 ["Proposition 13, while directing reassessment of property upon a 'change of ownership,' did not define that phrase."]; 63 Ops.Cal.Atty.Gen. 304, 309 (1980) [nothing in art. XIII A or the materials presented to the voters provides any guidance as to the meaning of "change in ownership."].)

The Legislature subsequently enacted provisions defining "change in ownership" and based on those statutes, the State Board of Equalization adopted detailed regulations explaining the statutory scheme. (Rev. & Tax. Code, §§ 60-66; Cal. Code Regs., tit. 18, § 462.)

Shuwa argues, because it is the sole province of the Legislature to determine when a "change in ownership" occurs, and because the first two steps in the transaction were expressly exempted by the Legislature as transfers not triggering a "change in ownership," the trial court finding of a 100 percent "change in ownership" was clearly erroneous and arrived at by ignoring the clear language of the statutes.[9] Specifically, Shuwa asserts the transfer by ARCO to Shuwa of its 50 percent interest in the Flower Street partnership was not a change of ownership of the property owned by the partnership under Revenue and Taxation Code section 64, subdivision (a),

---

[9] We note this appeal presents no challenge to the County's method of calculating the value of the ARCO Plaza for reassessment purposes.

because no partner obtained a "majority ownership interest" in the partnership as a result of the transfer, a prerequisite for finding a "change in ownership" of partnership interests.[10]

Shuwa further contends the distribution by the partnership of the property to Shuwa and Bank of America is also not a change in ownership under Revenue and Taxation Code section 62, subdivision (a)(2) because a pro rata distribution of real property by a partnership to its partners is merely a change in "the method of holding title" by the original coowners who retain their original proportional interests. Such a transaction is expressly excluded as a "change in ownership" in the Revenue and Taxation Code.[11] The sale to Shuwa by Bank of America of its 50 percent interest in the property did result in a change in ownership, but only to the extent of its interest in the property, i.e., 50 percent.[12]

Shuwa argues, because ARCO would not agree to a sale of anything other than its partnership interest due to the adverse federal income tax consequences of the alternatives, and because Shuwa did not want to purchase any more partnership interests than was necessary to consummate the transaction, each individual step is supported by a substantial, independent business

---

[10]The pertinent provisions of Revenue and Taxation Code section 64 are as follows:

"(a) Except as provided in subdivision (h) of Section 61 [cooperative housing] and subdivisions (c) and (d) [tax free transfer of assets to controlled corporation] of this section, the purchase or transfer of ownership interests in legal entities, such as corporate stock or partnership interests, shall not be deemed to constitute a transfer of the real property of the legal entity.

" . . . . . . . . . . . . . . . . . . . . . . . .

"(c) When a corporation, partnership, other legal entity or any other person obtains control, as defined in Section 25105, in any corporation, or obtains a *majority ownership interest in any partnership* or other legal entity through the purchase or transfer of corporate stock, partnership interest, or ownership interests in other legal entities, such purchase or transfer of such stock or other interest shall be a change of ownership of property owned by the corporation, partnership, or other legal entity in which the controlling interest is obtained." (Italics added.)

[11]Revenue and Taxation Code section 62, subdivision (a)(2) provides:

"Change in ownership shall not include: [¶] . . .[¶] (2) Any transfer between an individual or individuals and a legal entity or between legal entities, such as a cotenancy to a partnership, a partnership to a corporation, or a trust to a cotenancy, which results solely in a change in the method of holding title to the real property and in which proportional ownership interests of the transferors and transferees, whether represented by stock, partnership interest, or otherwise, in each and every piece of real property transferred, remain the same after the transfer. . . ."

[12]Revenue and Taxation Code section 61, subdivision (e) specifies a transfer of a cotenancy interest is an event triggering reassessment for property tax purposes:

"Except as otherwise provided in Section 62, change in ownership, as defined in Section 60, includes, but is not limited to: [¶] . . . [¶] (e) The creation, transfer, or termination of any tenancy-in-common interest, . . . ."

purpose and we are required to recognize the necessity and validity of the transaction as it actually occurred.[13]

 The County, on the other hand, urges this court to disregard the individual steps and rule when a purchaser intends to acquire all of the interests in a parcel of real property and when multiple transfers are contemplated in a single continuous transaction to accomplish this end, the separate steps should be ignored in determining whether there has been a "change of ownership."[14]

[13]In urging this court to separately apply the "change in ownership" rules of the Revenue and Taxation Code to each individual step in the overall transaction, Shuwa points to several cases in which Courts of Appeal have upheld strict application of the statutory provisions. (See, e.g., *E. Gottschalk & Co. v. County of Merced* (1987) 196 Cal.App.3d 1378 [242 Cal.Rptr. 526] [upholding statutory rule which treats certain long term leases as "changes in ownership"]; *Sav-On Drugs, Inc. v. County of Orange, supra,* 190 Cal.App.3d 1611 [minority shareholders' argument, because retained proportional interest in old and merged companies there should be no "change in ownership," rejected because newly formed corporation acquired control of real property within meaning of code]; *Kraft, Inc. v. County of Orange* (1990) 219 Cal.App.3d 1104 [268 Cal.Rptr. 643] [court rejected shareholders' characterization of reorganization as only a change in form of ownership of real property held by corporation where majority shareholders of old company retained majority ownership in new reorganized company because new company acquired control of the old company and its assets]; *Twentieth Century Fox Film Corp. v. County of Los Angeles* (1990) 223 Cal.App.3d 1158 [273 Cal.Rptr. 76] [although there was identity of shareholders before and after merger, court rejected request to go beyond the form to the substance of the transaction because newly formed corporation acquired control of the real property]; *Industrial Indemnity Co. v. City and County of San Francisco* (1990) 218 Cal.App.3d 999 [267 Cal.Rptr. 445] [sale/leaseback resulted in two "changes of ownership" where deed contained no "reservation" to exempt the transaction under the code]; see also, *Title Ins. & Trust Co. v. County of Riverside, supra,* 48 Cal.3d 84 [acquiring corporation reassessed because by obtaining control of subsidiary's parent corporation, obtained indirect control of subsidiary which held real property assets].)

However, none of these decisions stands for the proposition Shuwa advances. These decisions are not examples of Courts of Appeal upholding transactions structured to strictly comply with the technical requirements of the statutes while also resulting in wholly or partially avoiding property tax reassessment. Indeed, none of these decisions is directly applicable as none presents the precise factual situation involved in the case at bar. For example, none of the cited decisions required analysis of the tax consequences attendant on a simultaneous multi-step transaction as in the instant case. Nor do any of the decisions stand for the proposition each discrete step in an overall transaction must be separately analyzed and respected in the determination of tax consequences under the Revenue and Taxation Code. Certainly none directs this separate analysis when the net result is an exemption from property tax assessment. On the contrary, in each of these decisions, giving the precise statutory language its full effect resulted in a finding a "change of ownership" had occurred and that the real property was subject to reassessment. Under these circumstances, we find little support in the decisional authority for Shuwa's position.

[14]Alternatively, the County urges this court to accept a commonsense, lay definition of "change in ownership" and recognize that on one day ARCO and Bank of America owned the property and on the next day Shuwa did. While this argument has a logical appeal, it ignores the comprehensive and detailed provisions the Legislature enacted precisely to define "change

If each discrete step is separately analyzed under the statutes to determine whether a change in ownership occurred, our conclusion would have to be the entire transaction only resulted in a 50 percent "change in ownership." Thus, by concentrating on the letter, if not the spirit, of these provisions, use of this three-step process to purchase the ARCO Plaza could potentially avoid a 100 percent "change of ownership" and a 100 percent reassessment for property tax purposes. On the other hand, if the three steps are amalgamated and viewed in their entirety, it is clear the net result of the transaction is a 100 percent change in ownership with Shuwa acquiring all of ARCO Plaza on September 16, 1986.

## II. APPLICATION OF THE "STEP TRANSACTION DOCTRINE" IS APPROPRIATE IN THE CASE AT BAR.

In a case such as this, where the propriety and necessity for multiphase transactions is challenged, the "step transaction doctrine" has been applied to determine whether the transaction should be treated as a whole or whether each step of the transaction may stand alone. ■ The "step transaction doctrine" is a corollary of the general tax principle the incidence of taxation depends upon the substance of a transaction rather than its form. (*Comm'r* v. *Court Holding Co.* (1945) 324 U.S. 331 [89 L Ed 981, 65 S.Ct. 707].) Although the concept is not entirely alien to California jurisprudence, the doctrine was developed and is primarily utilized in the federal courts. (See, e.g., *W.E. Hall Co.* v. *Franchise Tax Bd.* (1968) 260 Cal.App.2d 179, 183 [66 Cal.Rptr. 911] ["In interpreting the transaction the taxing authority is not necessarily bound by the language the taxpayer chose to describe it or by the bookkeeping entries chosen to record it."]; *Sav-On Drugs, Inc.* v. *County of Orange, supra,* 190 Cal.App.3d 1611, 1622 ["Moreover, to adopt plaintiff's interpretation would effectively stifle the electorate's intent, as construed by the Legislature, that a change in control, direct or indirect, will permit a

of ownership." This responsibility fell directly on the Legislature and not on the courts to develop on a case by case basis. Under these circumstances we must respect the definitions of "change of ownership" as provided for in the duly enacted statutes and not create new ones at the urging of the County.

For the same reason we must reject the County's argument there was a "change in ownership" under section 60 of the Revenue and Taxation Code because the net result of the transaction was a "transfer of a present interest in property substantially equal to the value of the fee interest." Because this section was "intended as a guidepost in cases not covered by the specific inclusions or exclusions" in Revenue and Taxation Code sections 61-66, it is inapplicable in a case such as this where specific provisions cover the transactions which occurred. (*Industrial Indemnity Co.* v. *City and County of San Francisco, supra,* 218 Cal.App.3d 999, 1010.).

Nonetheless, both of these statements accurately characterize the *end result* of the multistep transaction in which the seller and buyer engaged and thus provide support for application of the "step transaction doctrine." (See pp. 1648-1657, *infra.*)

reassessment. Any reassessment could be avoided by a simple step transaction involving the creation of a wholly owned subsidiary for the purpose of holding title to corporate realty, . . ."]; State Bd. of Equalization Staff Correspondence, Property Taxes Law Guide (Dec. 24, 1981) Property Tax Annots. Change in Ownership, vol. 3, p. 5410.)[15]

The leading case in this area is *Gregory* v. *Helvering* (1935) 293 U.S. 465 [79 L.Ed.596, 55 S.Ct. 266]. In *Gregory*, a corporation, wholly owned by a taxpayer, transferred 1,000 shares of stock in another corporation held by it to a new corporation which then issued all of its shares to the taxpayer. Within a few days the new corporation was dissolved and liquidated by the distribution of the 1,000 shares to the taxpayer who immediately sold them for her individual profit. No other business was transacted, or intended to be transacted, by the new corporation. The plan was designed to conform to the code as a "reorganization" but for the sole purpose of transferring the shares to the taxpayer while providing a lower tax liability than with a direct dividend. The court held the plan conformed to the code but that there was no "reorganization within the intent of the statute." In so holding the court found the artifice of the new corporation a mere sham.

"Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find? Simply an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner. No doubt, a new and valid corporation was created. But that corporation was nothing more than a contrivance to the end last described. It was brought into existence for no other purpose; it performed, as it was intended from the beginning it should perform, no other function. When that limited function had been exercised, it immediately was put to death.

"In these circumstances, the facts speak for themselves and are susceptible of but one interpretation. The whole undertaking, though conducted according to the terms of subdivision (B), was in fact an elaborate and devious

---

[15]After this litigation commenced, the State Board of Equalization (SBE), assisted by the County, developed a uniform standard governing application of the step transaction doctrine:

"[W]here a taxpayer utilizes a series of transfers or steps to effect a transfer which might otherwise have been accomplished by fewer transfers or steps, we recommend that any steps in the transaction be disregarded if the county assessor concludes that they are not supported by a business purpose other than avoiding higher property taxes."

form of conveyance masquerading as a corporate reorganization, and nothing else. The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose." (293 U.S. at pp. 469-470 [79 L.Ed. at p. 599]; cf. *Frank Lyon Co.* v. *United States* (1978) 435 U.S. 561 [55 L.Ed.2d 550, 98 S.Ct. 1291] [upholding the validity of deductions of a sale/leaseback where the buyer/lessor/taxpayer wanted to diversify its investment holdings and the seller/lessee was prevented by banking regulations from issuing sufficient bonds and at a high enough interest rate to generate necessary capital on its own to finance a new building.].)

The doctrine has since been applied in a variety of situations and "commentators have attempted to synthesize from judicial decisions several tests to determine whether the step transaction doctrine is applicable to a particular set of circumstances in order to combine a series of steps into one transaction for tax purposes. Unfortunately, these tests are notably abstruse—even for such an abstruse field as tax law. And we must bear in mind, in applying the 'tests' that '[t]he step transaction doctrine is only a judicial device expressing the familiar principle that in applying the [tax laws], the substance rather than the form of the transaction is controlling.'" (*Redding* v. *C.I.R.* (7th Cir. 1980) 630 F.2d 1169, 1175; *Sun Oil Co.* v. *C.I.R.* (3d Cir. 1977) 562 F.2d 258, 263 [in determining effect of transaction on income tax liability, courts look to economic realities and not to labels applied by parties]; *Kanawha Gas & Utilities Co.* v. *Commissioner of Int. Rev.* (5th Cir. 1954) 214 F.2d 685, 691 ["In determining the incidence of taxation, we must look through form and search out the substance of a transaction."].)

In any event, under each of the relevant tests for application of the step doctrine, it appears the transactions in the case at bar should be stepped together to reveal what actually occurred—the acquisition by Shuwa of 100 percent of the ARCO Plaza. (Compare, Bittker & Eustice, Federal Income Taxation of Corporations & Shareholders (1979) § 14.18 [suggesting different tests applicable in different contexts].)

■ Under the "end result test," purportedly separate transactions will be amalgamated with a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result. (*King Enterprises, Inc.* v. *United States* (1969) 189 Ct.Cl. 466 [418 F.2d 511, 516]; *Redding* v. *C.I.R., supra*, 630 F.2d at p. 1175 [issuance of warrants viewed as dividends and

later sale of stock purchased with warrant rights not stepped together because not a necessary or integral component of same transaction]; *McDonald's Restaurants of Illinois* v. *C.I.R.* (7th Cir. 1982) 688 F.2d 520, 524 [issuance of stock and later sale of stock stepped together to meet test for tax free merger where obvious purpose of transactions to eliminate these shareholders entirely]; *Security Industrial Ins. Co.* v. *United States* (5th Cir. 1983) 702 F.2d 1234, 1246 [intended result of each series of transactions was acquisition of targets' assets]; *Minnesota Tea Co.* v. *Helvering* (1938) 302 U.S. 609, 613 [82 L.Ed. 474, 477, 58 S.Ct. 393] ["The preliminary distribution to the stockholders was a meaningless and unnecessary incident in the transmission of the fund to the creditors, all along intended to come to their hands, so transparently artificial that further discussion would be a needless waste of time."].)

Here it appears the three steps were really component parts of a single transaction. The ultimate result intended from the outset was for Shuwa to acquire *all* of the ARCO Plaza from the present owner, a partnership. It initially offered to buy the Plaza outright from the partnership. When this offer was refused it signed a letter of intent to purchase all of the partnership interests representing the ARCO Plaza. The letter demonstrated Shuwa's intent to do whatever was necessary to ensure securing the property. Signing the purchase and sale agreement before receipt of a formal "favorable" opinion letter on the property tax consequences showed its willingness to go ahead with the deal even in the face of a potential 100 percent reassessment and despite its avowed desire to avoid potential partnership liability.[16] The final sale and purchase agreement arranged for the ultimate transfer of all of ARCO Plaza to Shuwa. All of these facts point to the single intended result that the plan was for Shuwa to acquire all of the property.

The second test is the "interdependence test" which requires an evaluation of "whether on a reasonable interpretation of objective facts the steps [are] so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." (*King Enterprises, Inc.* v. *United States, supra,* 418 F.2d 511, 516; *Redding* v. *C.I.R., supra,* 630 F.2d 1169, 1177; 3 Mertens, The Law of Federal Income Taxation

[16]Although Shuwa acknowledges the SBE opinion letter, concluding the three transactions would result in a 50 percent "change in ownership," is not binding but advisory only, it claims the opinion is entitled to "great weight" nevertheless because the SBE is the agency charged with administering the property tax laws. (See, *Culligan Water Conditioning* v. *State Bd. of Equalization* (1976) 17 Cal.3d 86, 93 [130 Cal.Rptr. 321, 550 P.2d 593].)

In our view, because of the number of assumptions on critical matters the SBE was required to make in reaching this conclusion, and because the letter expressly states it is not binding, it is questionable whether the opinion letter is even entitled to "great weight."

(1981) § 20.161.) This test concentrates on the relationship between the steps and queries whether one step would have been taken without any of the others. (*McDonald's Restaurants of Illinois* v. *C.I.R.*, *supra*, 688 F.2d at p. 524; *Security Industrial Ins. Co.* v. *United States*, *supra*, 702 F.2d at p. 1247 ["An analysis of the transactions at issue in this case indicates that each step was dependent for its success upon each of the others; in isolation, the steps were meaningless."].) Here the answer is clearly in the negative.

As stated, Shuwa's primary goal was to acquire *all* of the ARCO Plaza. The first step would have been useless without the other steps. It would not have purchased ARCO's partnership interest in Flower Street without also somehow acquiring Bank of America's interest in the property. First, it did not want a partial ownership interest, as evidenced by the two letters of intent it signed to acquire all of the property outright. Secondly, its purported reason for taking the three steps in this transaction in the first place was to minimize partnership liability exposure. Shuwa presumably would never have agreed to only acquire the only interest it said it did not want—a partnership interest, and a partial one at that.

The creation of the cotenancy likewise served no other purpose than to facilitate the sale of the remaining interest in the property to Shuwa. The cotenancy had no other function and served no purpose other than to act as a conduit to dispose of Bank of America's interest in a manner which suited Shuwa's concerns about purchasing partnership liabilities and about property tax reassessment. The second step was only made necessary because of the other contemplated steps.

The third step of the sale of the bank's remaining interest in the ARCO Plaza was only necessitated by the existence of the prior two steps to effectuate Shuwa's desire for all of the property. Because these three steps were sufficiently indispensable to achieve the plan for a total transfer of the ARCO Plaza to Shuwa, and because each individual step would have been useless without a completion of the series, we are compelled to view this as a unitary transaction under the "interdependence test."

■ This view is further strengthened by application of the "binding commitment" test. This is the most restrictive test and generally forbids the use of the step transaction doctrine unless "if one transaction is to be characterized as a 'first step' there [is] a binding commitment to take the later steps." (*Redding* v. *C.I.R.*, *supra*, 630 F.2d at p. 1178, quoting *Commissioner* v. *Gordon* (1968) 391 U.S. 83, 96 [20 L.Ed.2d 448, 458, 88 S.Ct. 1517]; see also, Bittker & Eustice, Federal Income Taxation of Corporations

& Shareholders, *supra*, § 14.51 [suggesting "binding commitment" test may be reserved for situations where the taxpayer rather than the government invokes the "step transaction doctrine"]; compare *McDonald's Restaurants of Illinois* v. *C.I.R.*, *supra*, 688 F.2d at p. 525 [finding "binding" commitment from legal limitations on corporation's rights not to register stock promptly although not contractually bound to do so within a specified period].)

In this case there was a binding commitment to execute all three steps. Section 12.14 of the purchase and sale agreement represented the parties' covenant to use their best efforts to structure the transaction using the three steps in the event they received a favorable ruling from the SBE. After receiving a response from the Board, the parties added section 14 which modified section 12.14 to require the transaction be structured to employ the three steps upon request of any party. The parties subsequently agreed to execute the plan utilizing the three steps and specified the transfer documents were to be effective simultaneously upon close of escrow. This series of contracts bound the parties and their agents to the three-step plan.

Under any of the three applicable criteria, it becomes apparent the three transfers should be stepped together and the transaction viewed as a purchase of 100 percent of the ARCO Plaza by Shuwa.

Shuwa nevertheless argues the step transaction doctrine should not be applied because independent business considerations, apart from avoidance of property tax, motivated each of these transactions. It argues ARCO's desire to avoid additional federal income tax and Shuwa's desire to avoid additional partnership liability should be sufficient independent business considerations to override the general tax policy of considering substance over form.

In support of its position Shuwa points to sales tax annotation 395.1840 (SBE Business Law Guide (Mar. 1, 1966) p. 3274) in which the step transaction doctrine was not applied in a sale of partnership assets to a commencing corporation for stock because the corporations commissioner required the sale to the partners to take place before any sale of stock for cash. However, the three transactions in this case were not compelled by any regulatory agency. (Cf. *Frank Lyon Co.* v. *United States*, *supra*, 435 U.S. 561 [deductions allowed from sale/leaseback arranged to generate cash for federally regulated bank restricted in its bond offerings and interest paid on bonds].) Nor does Shuwa contend the alleged independent business considerations rise to the level of business exigencies made necessary by unrelated outside forces.

Indeed, the arguments presented to support the validity of the multiple transfers bear more than a passing resemblance to those advanced in *Kuper* v. *C.I.R.* (5th Cir. 1976) 533 F.2d 152, a decision instructive on the point of what constitutes a substantial independent business motive.

In *Kuper*, three brothers owned in equal shares the outstanding stock of Kuper Volkswagen, an automobile dealership. The brothers also held a pro rata share of all the stock of Kuper Enterprises (Enterprise), a realty company which leased land and buildings to Kuper Volkswagen. The siblings ultimately had serious disputes over management which threatened the very existence of the dealership. One of the brothers, George, agreed to leave and start his own Volkswagen dealership in another state. However, because the parent company, Volkswagen of America, did not permit the same person to invest in or manage two distinct Volkswagen dealerships, it became necessary for George to relinquish his Kuper Volkswagen stock. The brothers accomplished this task by a series of transactions.

First, the brothers contributed their enterprise stock to Kuper Volkswagen. On the same day, the board of directors of Kuper Volkswagen made a cash contribution to Enterprise of over $42,000. Finally, Kuper Volkswagen exchanged its 100 percent ownership of Enterprise for George's one-third interest of Kuper Volkswagen.

The brothers reported no taxable income from the transactions, characterizing the transactions as 1) a nontaxable contribution of Enterprise stock to Kuper Volkswagen; 2) a nontaxable cash contribution by Kuper Volkswagen to Enterprise; and 3) a total redemption of George's Kuper Volkswagen stock taxable at the corporate level as well as to George personally. The commissioner based the deficiency notices on his characterization of the transactions as taxable exchanges of stock and constructive dividends paid to the Kupers by Kuper Volkswagen.

The Court of Appeals acknowledged the transactions' conformity to the tax codes but upheld the commissioner, finding the taxpayers' acts were in essence taxable stock for stock exchanges at the shareholder level, and further finding that a " 'given result at the end of a straight path is not made a different result because reached by following a devious path.' " (533 F.2d at p. 156, citing *Minnesota Tea Co.* v. *Helvering*, *supra*, 302 U.S. 609, 613 [82 L.Ed. 474, 477].)

In addressing the taxpayers' argument application of the step doctrine was inappropriate, the court stated: "Petitioners criticize this refusal to recognize the integrity of each of the individual steps of the transaction. They argue

that taxpayers are permitted to arrange their tax affairs so as to minimize the amount owed to the [government]. Unquestionably the taxpayer has a legal right to plan his business activities in the light of the tax laws. *Gregory* v. *Helvering* [1935] 293 U.S. 465, 469 [79 L.Ed. 596, 599, 55 S.Ct. 266]. The Commissioner, however, must accept the form and accompanying legal characterization of taxpayer's business transactions only insofar as they are comprehended within the intention of the pertinent revenue statutes. *Id.* We do not believe that Congress intended that under the circumstances of the present case taxpayers could utilize this series of steps to artificially avoid the tax incidents of a simple stock exchange. . . . '[Taxpayers] cannot compel a court to characterize the transaction solely upon the basis of a concentration on one facet of it when the totality of circumstances determines its tax status. The most obvious answer to Taxpayer's argument that the parties' characterization is conclusive is that such a result would completely thwart the Congressional policy to tax transactional realities rather than verbal labels . . . . Otherwise, form, rather than substance, would invariably prevail." (533 F.2d at p. 156, citing *Crenshaw* v. *United States* (5th Cir. 1971) 450 F.2d 472, 477-478.)

The taxpayers argued the integrity of each step in the transaction should be respected because the plan was motivated by the legitimate business goal of reducing friction in the management of Kuper Volkswagen without impairing its working capital. Finding alternative financing was available, the court explained: "A legitimate business goal does not grant taxpayer *carte blanche* to subvert Congressional tax patterns. [Citation.] . . . [¶] As a general matter, it is important to emphasize that we are not saying that the exigencies of business finance can never legitimize the taxpayers' choice of a route different from that favored by the Internal Revenue Service, or that in arranging business dealings taxpayers have no flexibility in structuring their transactions as their judgment deems best. In certain circumstances, the Congress has approved the use of alternative tax and business paths to a given end. [Citations.] However, for this Court to permit taxpayers randomly to piece together the various provisions of the Code unhampered by any limits on the artificiality of their constructions would leave the Congressional[ly enacted] taxing scheme in shambles. Because all of the combinations conceivable by a resourceful tax bar cannot be perceived in advance and because the background circumstances vary so greatly from case to case, we are unable to draw a single bright line separating in all instances unacceptable artifice from valid tax planning. Whatever the exact location of this boundary, it is clear that the present taxpayers have crossed over to an area where their transaction must be collapsed, characterized, and taxed on the basis of its substance . . . ." (533 F.2d at pp. 158-159.)

Similarly in this case, the asserted independent business reasons cannot sanctify the parties' actions. The desire to avoid additional federal income tax liability may or may not be a legitimate business purpose justifying a particular structure to a transaction.[17] It is a matter of some doubt on which we express no opinion.

On the other hand, Shuwa's desire to limit potential liability from the purchase of partnership interests did not mandate this particular three-step process despite Shuwa's argument to the contrary. In oral argument, counsel for the County suggested an alternative structure which would have accommodated all of the parties' "independent business reasons" for structuring the transaction as they did. ARCO could have sold its partnership interest to Bank of America. Bank of America could then have sold the ARCO Plaza to Shuwa. This arrangement would have satisfied ARCO's need to only sell its partnership interest, as well as Shuwa's desire not to purchase any more partnership interests than were necessary to complete the transaction. Indeed, this arrangement would have offered Shuwa even greater protection from exposure to potential partnership liability than it achieved in the actual transaction as consummated. Structuring the transaction in this fashion would have resulted in fewer steps and fewer complications. It also clearly would have resulted in a 100 percent "change in ownership" for property tax reassessment. Perhaps for this reason this proposed structure for the transaction, if considered, was rejected in favor of the three-step transaction which the parties contemplated would only result in a 50 percent "change in ownership" for reassessment purposes.

Moreover, potential partnership liability could be avoided through numerous alternative measures. The parties could have insured against possible partnership liability. Shuwa could have been indemnified against potential

---

[17]The County concedes the legitimacy of ARCO's business purpose. We do not, however, find this concession to be dispositive of the issues before the court.

As noted in *Associated Wholesale Grocers, Inc.* v. *U. S.* (10th Cir. 1991) 927 F.2d 1517, even the existence of a business purpose does not necessarily preclude application of the "step transaction doctrine." "The law is unclear as to the relationship between the step transaction doctrine and the business purpose requirement. Our survey of the relevant cases suggests that no firm line delineates the boundary between the two. Most cases applying the step transaction doctrine, far from identifying business purpose as an element whose *absence* is prerequisite to that application, do not even include discussion of business purpose as a related issue. [See, e.g., *Court Holding, supra,* 324 U.S. 331; *Security Industrial, supra,* 702 F.2d 1234; *King Enterprises, supra,* 418 F.2d 511; *Kanawha Gas, supra,* 214 F.2d 685.] In some cases, the existence of a business purpose is considered one factor in determining whether form and substance coincide. In others, the lack of business purpose is accepted as reason to apply the step transaction doctrine. We have found no case holding that the existence of a business purpose precludes the application of the step transaction doctrine." (*Id.* at pp. 1526-1527; italics in original; fns. deleted.)

unknown liability. Alternatively, the sales price could be reduced to reflect any future potential partnership liability. Indeed, the parties admit and the record reflects many of these protective steps were in fact taken.

Even accepting the merit of the parties' asserted motives for structuring the transaction in this manner, we cannot accept the position they are sufficiently substantial to allow this court to ignore the intent and spirit of the Revenue and Taxation Code. To allow this brand of tax planning would encourage partnerships, corporations and other legal entities to escape reassessment in perpetuity by the mere expedient of transferring partial interests in a series of transactions on the weakest of alleged economic motivations. This, we feel, would subvert the intent of the people in passing Proposition 13 and the intent of the Legislature in enacting the provisions implementing article XIII A of the California Constitution. We cannot describe with precision exactly which combination of business exigencies would justify upholding form over substance, but we do know this is not such a case.

### DISPOSITION

The judgment is affirmed. Respondent to recover its costs on appeal.

Woods (Fred), J., concurred. Lillie, P. J., concurred in the judgment.

Appellant's petition for review by the Supreme Court was denied March 12, 1992.