[No. G011881. Fourth Dist., Div. Three. Nov. 20, 1992.]

CROW WINTHROP OPERATING PARTNERSHIP, Plaintiff and Respondent, v.
COUNTY OF ORANGE, Defendant and Appellant.

## Counsel

Terry C. Andrus, County Counsel, and Thomas C. Agin, Deputy County Counsel, for Defendant and Appellant.

Flavin & Baker and Sean Flavin for Plaintiff and Respondent.

## Opinion

**SONENSHINE, J.**—The County of Orange (County) appeals a judgment which determined Fluor Corporation's sale of real property to Crow Winthrop Operating Partnership did not trigger a reassessment for property tax purposes.

# I

Fluor Corporation owned two parcels of property: one, the headquarters area, comprised of a tower and office space buildings on 15 acres of land, and the other, 90 acres of undeveloped land surrounding the buildings. Pursuant to an October 31, 1984, agreement, Fluor agreed to sell the two parcels to Crow Irvine No. 1. Two subsidiaries of Crow would be the eventual specific buyers—the headquarters area was to be purchased by Crow Winthrop Operating Partnership (CWOP), and the remaining land by Crow Winthrop Development Limited Partnership.[1]

Paragraph 12.01 of the agreement provided: "Prior to the closing, Seller, as owner, and FEI [Fluor's wholly owned subsidiary, Fluor Engineers, Inc.], as tenant, shall enter into three (3) leases covering the Leased Improvements in the form of the three (3) lease agreements attached hereto . . . ." FEI would be made a 50-year tenant of the headquarters area. Then the sale would go forward, subject to the three long-term leases.

In January 1985, Fluor requested an opinion from the State Board of Equalization (SBE). The letter stated that Fluor "has signed a written agreement to sell the property to an unrelated purchaser . . . and to *lease back* all or part of the property for an indefinite term" (italics added) and asked whether the planned structure for the transaction would trigger a change-in-ownership reassessment of the headquarters property.[2] The SBE, by tax counsel Eric Eisenlauer, advised that "[s]ince [Fluor] and the Subsidiary . . . are members of an 'affiliated group' within the meaning of Section 64(b) [Revenue and Taxation Code] and Property Tax Rule 462(j)(2)(A) (Title 18, Cal. Admin. Code), the transaction would not constitute a change in ownership."[3]

In May 1985, Crow Irvine No. 1 transferred its interest in the agreement to its two related entities. Pursuant to the original agreement, Fluor and FEI

[1]There was no challenge to change in ownership status for the surrounding property sold to the development partnership, although there is apparently a dispute over the amount of the reevaluation.

[2]The request offered three possible configurations for the transaction: (1) as it actually occurred—Fluor rents to FEI, then sells to CWOP; (2) Fluor transfers fee to FEI, retaining long-term lease in the deed; FEI sells to CWOP; and (3) Fluor sells to CWOP, reserving in the deed a long-term lease.

[3]The letter contained the following caveat: "The views expressed in this letter are, of course, only advisory in nature. They are not binding upon the assessor of any county. You may wish to consult the appropriate assessor(s) in order to confirm that the described property will be assessed in a manner consistent with the conclusions stated above." Needless to say, the assessor was not approached.

executed and recorded the master leases on July 26, each for a term of 50 years and 4 days, beginning on July 26. Title was transferred to CWOP by grant deed, dated the 26th and recorded on the 30th.

In April 1986, the county assessor announced the sale would be treated as a change in ownership and requested the SBE reconsider its prior letter advice to Fluor. In its answer, the SBE stated that it had asked Eisenlauer for his "current comments," which were cited as follows: " '. . . if all the relevant documents, facts and circumstances indicate that, in substance, a reappraisable sale and leaseback has occurred in this case, the Assessor has strong arguments to treat the transaction in question as a change in ownership notwithstanding the exclusionary provisions of Sections 62(g) and 64(b).' "

The headquarters property was reassessed as of July 30, 1985, and the imposed taxes were paid by CWOP. CWOP unsuccessfully sought relief from the Assessment Appeals Board. Application to the County Board of Supervisors remained unanswered, and CWOP filed a complaint for refund in the superior court. The court found there was no change in ownership because the sale was subject to preexisting 50-year leases. A tax refund was ordered.

II

*Applicable Law*

In 1978, California, by initiative, adopted Proposition 13, setting the maximum amount for ad valorem taxes on real property at one percent "of the full cash value of such property." (Cal. Const., art. XIII A, § 1, subd. (a).) Full cash value is defined, in section 2, subdivision (a), as that amount appearing on the 1975-1976 roster "or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment."

"Change in ownership" is defined as "a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest." (Rev. & Tax. Code, § 60.)[4] Specific examples include *creation* of a lease of 35 or more years or "any transfer of a lessor's interest in taxable real property subject to a lease with a remaining term (including renewal options) of less than 35 years." (§ 61, subd. (c)(1).) Transfers among parent and subsidiary corporations or

---

[4] All statutory references are to the Revenue and Taxation Code unless otherwise specified.

partnerships are generally not subject to reassessment procedures. (§ 64, subd. (b).)

A list of specific transactions which *do not* constitute a change in ownership are contained in section 62, including (1) "Any transfer of a lessor's interest in taxable real property subject to a lease with a remaining term (including renewal options) of 35 years or more" (§ 62, subd. (g)), and (2) "Any transfer by an instrument whose terms reserve to the transferor an estate for years or an estate for life . . . ." (§ 62, subd. (e).)

### III

The sole issue is whether Fluor's sale of the 15-acre parcel to CWOP constitutes a change in ownership, where the sale is subject to long-term master leases executed (1) pursuant to an agreement of sale, and (2) just prior to transfer of title. The trial court concluded the sale was not a change in ownership because it was subject to a lease of over 35 years; this, in turn, precluded the receipt of a present or beneficial interest, or one substantially equivalent to the fee value of the property. It determined the transfer was not a sale and leaseback, but a reservation of an estate for years. We conclude otherwise.

Generally, a change in ownership occurs upon "[t]he creation of a leasehold interest in taxable real property for a term of 35 years or more . . . ." (§ 61, subd. (c)(1).) However, here the original transfer, in the form of three 50-year leases from Fluor to its wholly owned subsidiary, does not, standing alone, trigger reassessment under Proposition 13: "[A]ny transfer of real property among members of an affiliated group . . . shall not be a change of ownership." (§ 64, subd. (b).)

CWOP claims the next step in the transaction, the sale subject to a long-term lease, is shielded from reassessment pursuant to section 62, subdivision (g): No change in ownership occurs upon the "transfer of a lessor's interest in taxable real property subject to a lease with a remaining term (including renewal options) of 35 years or more." Under the circumstances of this case, the tax-proof armor cannot be passed on to CWOP.

We first note that in the trial court, CWOP filed a supplemental pretrial brief, citing a recently filed opinion by the Second District, *Pacific Southwest Realty Co.* v. *County of Los Angeles* (B044028), although a petition for review was pending in the Supreme Court. The Court of Appeal had held that a sale subject to a leaseback was *not* a change in ownership under section 62, subdivision (e) and the applicable SBE rules. Thus, CWOP

argued (1) the leases in its case were in existence *prior to* the sale and transfer, and (2) even if read as a sale subject to a leaseback, *Pacific Southwest* was "controlling authority" for exempting the transaction.

On review, however, in *Pacific Southwest Realty Co.* v. *County of Los Angeles* (1991) 1 Cal.4th 155 [2 Cal.Rptr.2d 536, 820 P.2d 1046], the Supreme Court held that "when a vendor sells a fee simple interest to a purchaser and simultaneously acquires from the latter a leasehold interest in the property, a change in ownership has occurred." (*Id.* at p. 159.) The *Pacific Southwest* purchase agreement contained a condition similar to that in the original agreement to purchase in the present case: "One *condition precedent* to the sale was the execution of the lease, which conveyed an estate for years . . . ." (*Ibid.,* italics added.) There, too, the SBE had originally recommended a no-change-in-ownership determination for the leased portion of the land.

Addressing first the section 60 three-prong test for determining whether a transfer is a change in ownership, the court stated there *was* a transfer of a present interest, regardless of the presence of a long-term lease. The lease was a present possessory interest, but *not* a fee interest. "The entire fee was transferred to [CWOP]; the simultaneous creation of a different interest in [the seller or its subsidiary] will not defeat the first prong of section 60." (1 Cal.4th at p. 163, fn. omitted.)

As to the "beneficial use" of the property, the court declined to find the long-term lessee held that interest as opposed to the buyer. It cited with approval *Industrial Indemnity Co.* v. *City and County of San Francisco* (1990) 218 Cal.App.3d 999, 1005 [267 Cal.Rptr. 445]: " 'The fact that [the buyer] may not occupy the property during the lease period does not deprive it of its right to enjoy the *value* of the property represented by the rent. [Citations.] The sale and leaseback constituted a transfer of the beneficial use of the property within the meaning of section 60.' " So, too, with consideration of the value transferred as substantially equal to the value of the fee interest. CWOP "acquired the entire fee [and] not only did the value of the interest transferred 'substantially equal . . . the value of the fee interest,' it was of identical value because it was a transfer of the fee itself. [Citation.]" (*Pacific Southwest Realty Co.* v. *County of Los Angeles, supra,* 1 Cal.4th 155, 164.) This third prong was meant to shield only those transfers conveying an estate of lesser *value* (such as short-term leases and reservations of life estates); and there was "no indication that the property would resell for less than the market price." (*Ibid.*)

 Turning to the exclusions under section 62, the court found neither subdivision (g) nor (e) applicable. Subdivision (g) states no change in

ownership, for property tax purposes, occurs upon transfer of a lessor's interest in real property subject to a lease exceeding 35 years. Because the estate for years in *Pacific Southwest* was reserved in the grant deed, and although execution of the lease was a condition precedent to the sale, the court stated "there was no existing lease and hence no remaining term." (*Pacific Southwest Realty Co. v. County of Los Angeles, supra,* 1 Cal.4th 155, 167.) But the court relied as well on an examination of the legislative intent behind subdivision (g). Excluding transfer of a lessor's interest in property subject to an *existing* long-term lease from reassessment protects against a "tax increase for a lessee that has erected major capital improvements on the land and whose lease requires the lessee to pay property taxes. The increase could occur merely because the lessor has sold that interest to a third party—a transfer over which the lessee has no control." (1 Cal.4th at p. 168.) That was *not* the situation in *Pacific Southwest.* There, both parties changed positions. They "established their relationship at the time of the conveyance . . . ." (*Ibid.*)

Similarly, the court found section 62, subdivision (e), which exempts a transfer reserving an estate for years, did not apply. Because the transaction before it *was* subject to a finding of change in ownership pursuant to section 60, a contrary result under section 62, subdivision (e) would conflict with the drafters' intention: "the examples set forth in sections 61 and 62 were to be derivative or explanatory, and not to conflict with section 60's general rule." (1 Cal.4th at p. 169.) Moreover, it was clear the drafters meant the term to include only those reservations in which the transferor retained the *beneficial* use of the property. ▆▆ ▆ ▆ Pacific Southwest "did not retain a beneficial use of the property for itself; it pays rent to [the new owner], which enjoys the entire beneficial interest in the property." (*Id.* at pp. 170-171; *Industrial Indemnity Co. v. City and County of San Francisco, supra,* 218 Cal.App.3d 999, 1006.)[5]

▆▆ To the extent that CWOP contends its situation is not analogous to *Pacific Southwest,* we observe the following. First, the transfer of the over-35-years lease from Fluor to FEI is not recognized as a change in ownership because it essentially *is not one.* The parent remains in control. As such, Fluor remained the controlling party of the lease, when it was assigned to CWOP. Second, the transfers—of the fee to CWOP and the tenancy to FEI through its parent—were essentially simultaneous. The contract of sale

---

[5]Any SBE regulations to the contrary are of no moment. "An administrative rule that exceeds the Legislature's grant of authority as expressed in section 60 et seq. is without effect and may not be enforced." (*Pacific Southwest Realty Co. v. County of Los Angeles, supra,* 1 Cal.4th 155, 171.)

(executed *long* before the leases) required the leases as a precedent condition of the purchase, just as did the agreement in *Pacific Southwest.* The grant deed, from Fluor to CWOP, "subject to all . . . leases . . . whether or not of record," was executed on July 26, the same day the leases were executed. The assignment of the leases was similarly executed by *both* parties on July 26 and specifically provides: "This Assignment is made concurrently with and as an incident to the conveyance by Assignor to Assignee of the real property . . . pursuant to the [purchase agreement] dated as of October 31, 1984." *All of the transfers* were consummated on the same day. The leases "preexisted" the conveyance, if at all, by a matter of minutes. The transaction is in substance a sale/leaseback.

*Shuwa Investments Corp.* v. *County of Los Angeles* (1991) 1 Cal.App.4th 1635 [2 Cal.Rptr.2d 783] supports our conclusion. There, Flower Street Limited, whose equal partners were Atlantic Richfield and Bank of America, owned the ARCO Plaza, which Shuwa desired to purchase. They devised a three-step process: Atlantic Richfield sold its 50 percent partnership interest to Shuwa; Bank of America and Shuwa liquidated the partnership and distributed to themselves undivided interests in ARCO Plaza; and Shuwa purchased Bank of America's interest in the Plaza. A letter opinion from the SBE indicated the transaction should generate only a 50 percent change-in-ownership assessment. A purchase agreement outlined the plan, which was completed through escrow. The county assessor, however, determined there had been a 100 percent change in ownership.

On appeal, the court agreed that, if each of the steps of the transaction were examined individually and in a vacuum, the result would be but a 50 percent change in ownership. Step one—sale of the 50 percent interest in the partnership to Shuwa—would be exempt under section 64, subdivision (a).[6] Step two—liquidation of the partnership and distribution to the partners—would be exempt under section 62, subdivision (a)(2).[7] That leaves only the sale of one-half of the Plaza by Bank of America to Shuwa, suggesting reassessment of only one-half of the property.

The court declined to adopt the subterfuge, choosing instead to apply the "step transaction" doctrine "to determine whether the transaction should be

---

[6]"[T]he purchase or transfer of ownership interests in legal entities, such as corporate stock or partnership interests, shall not be deemed to constitute a transfer of the real property of the legal entity" (§ 64, subd. (a)), so long as the purchaser does not receive a "majority ownership interest" as the latter would "be a change of ownership of property owned by the . . . partnership . . . ." (§ 64, subd. (c).)

[7]A change in ownership does not arise by "[a]ny transfer between . . . individuals and a legal entity . . . which results solely in a change in the method of holding title . . . and in which proportional ownership interests of the transferors and tranferees . . . remain the same after the transfer. . . ." (§ 62, subd. (a)(2).)

treated as a whole or whether each step of the transaction may stand alone." (*Shuwa Investments Corp.* v. *County of Los Angeles, supra,* 1 Cal.App.4th 1635, 1648.) This essentially recognizes " ' "the familiar principle that in applying the [tax laws], the substance rather than the form of the transaction is controlling." ' [Citations.]" (*Id.* at p. 1650.)

Three relevant tests were addressed—"end result," "interdependence" and "binding commitment." Under the "end result" test, the procedures can be treated as a single transaction if each step was intended, from the beginning, "to be taken for the purpose of reaching the ultimate result." (1 Cal.App.4th at p. 1650.) In *Shuwa,* all three steps were contemplated by the parties to achieve one purpose—acquisition of ARCO Plaza by Shuwa.

The "interdependence" test looks to whether the actions are " 'so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series.' [Citations.]" (1 Cal.App.4th at p. 1651.) Shuwa wanted the entire Plaza; a one-half interest through the partnership did not accomplish its purpose and was but a means to buy the remaining interest held by Bank of America. And that latter purchase "was only necessitated by the existence of the prior two steps to effectuate Shuwa's desire for all of the property." (*Id.* at p. 1652.) Thus, "each individual step would have been useless without a completion of the series . . . ." (*Ibid.*)

The "binding commitment" test addresses whether the first step, once taken, requires taking the remainder. Under the sale agreement, the parties agreed to structure the purchase pursuant to the three-step procedure, binding them to the plan. Because all three tests were met, the court ruled the transfer-in-series resulted in a 100 percent transfer of ownership.

 CWOP fares no better. Under the "end result" approach, it is clear the parties intended CWOP would purchase the fee interest in the property and become the landlord in a long-term lease of the property. As early as October 1984, their contract spelled out the sale particulars and stated the leases, yet to be arranged between Fluor and FEI, were *required* to consummate the sale. "Master Lease," as defined in the contract, "means collectively the three leases entered into between Seller, as Landlord, and [FEI], a wholly-owned subsidiary of Seller, as Tenant, as to which, upon Closing, Buyer will become Landlord . . . ." CWOP in its opening brief insists "[t]he main criteria for such a sale was *Fluor* retaining control of the use of the Headquarters Facility on a long-term basis." (Italics added.) That could have been accomplished by the simple expedient of a sale/leaseback. However, that *would* have been subject to reassessment. Based on the series of

letters to and from the SBE, the intent was that CWOP would acquire the property *without* triggering a reassessment.

Pursuant to the "interdependence" test, we ask "whether one step would have been taken without any of the others." (*Shuwa Investments Corp.* v. *County of Los Angeles, supra*, 1 Cal.App.4th 1635, 1652.) Clearly, Fluor had been operating without the necessity of setting up a lease with its subsidiary. Nonetheless, one was required by the 1984 sale agreement, but was *not* consummated until all other aspects of the sale were complete. The master lease was not signed by Fluor and FEI until July 26, 1985, the same day the grant deed, subject to those leases, was signed by Fluor. The leases had no independent meaning—they were clearly the determinative factor in completing the sale and long-term lease without incurring a reassessment of this extremely valuable piece of property.

The "binding commitment" test, usually the most restrictive, is most easily met here. The sale agreement recognized the necessity of the subsidiary lease. Once in place, there was no obstacle to the intended purchase by CWOP. The two-step process was agreed upon from the inception; once the initial step was taken, the conditions for transfer of the fee were met. The intent of the entire transaction was to sidestep what would otherwise have been a reassessment of the property.

Judgment reversed. The matter is remanded to the trial court to enter judgment for the County of Orange.

Sills, P. J., and Wallin, J., concurred.