Filed 1/30/15  Certified for Publication 2/23/15 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

DYANLYN TWO et al.,

    Plaintiffs and Appellants,

      v.

COUNTY OF ORANGE,

    Defendant and Respondent.

G049269

(Super. Ct. No. 30-2012-00618968)

O P I N I O N

         Appeal from a judgment of the Superior Court of Orange County, Linda S. Marks, Judge.  Reversed and remanded with directions.

         Law Offices of Wade E. Norwood and Wade E. Norwood for Plaintiffs and Appellants.

         Nicholas S. Chrisos, County Counsel, and Laurie A. Shade, Senior Deputy County Counsel, for Defendant and Respondent.

This case concerns the County of Orange's property tax reassessment of a retail shopping center located in the City of Westminster. The Assessment Appeals Board and the trial court both concluded reassessment was proper because there was a change of ownership of the subject property when it was purchased by the long-term lessee and a third party investor. We conclude there was no change of ownership for property tax purposes and reverse the trial court's judgment.

I

The parties do not dispute the facts of the various transactions in this case, only the legal conclusions to be drawn from them. The appeal concerns "the Golden Westminster Specialty Center" located at 15212 and 15300 Goldenwest Street (the property). It consists of two adjoining parcels of improved real property identified as Assessor's Parcel Numbers 142-383-13 and 142-401-62.

In 1977, the owners of the subject property[1] entered into a 60-year ground lease with Golden Westminster Specialty Center (Golden Westminster). The term was from June 15, 1977, to June 14, 2037. The lease contained a purchase option permitting Golden Westminster to purchase the subject property during either the 25th year of the ground lease (2002), or the 30th year of the ground lease (2007). Golden Westminster was required to give 60 days' written notice if they intended to purchase the property.

At the time, Golden Westminster was a general partnership comprised of John P. Sullivan, individually, and Dyanlyn Development Company, a general partnership. Dyanlyn Development Company was comprised of general partners Diane Kolodziejski and L. Herbert Lundin. Sullivan, Kolodziejski, and Lundin executed the 60-year lease on behalf of Golden Westminster.

---

[1]     The original landlord was Crocker National Bank (Crocker) as corporate co-trustee for Carpenters Pension Trust for Southern California. After several years the trustee changed from Crocker to Union Bank and then to CPT/SC Title Holding Corporation.

Golden Westminster constructed a shopping center on the land and operated it for 30 years. In early December 2006, the landlord and Golden Westminster amended the lease, extending its term by an additional 15 years to June 30, 2052.

On December 28, 2006, the landlord sold the property to the following parties: (1) 25 percent to the Gail & John Sullivan Revocable Trust; (2) 25 percent to Sechelt Associates, LP; and (3) 50 percent to Dyanlyn Two (collectively referred to Dyanlyn unless the context requires otherwise). These entities purchased the property as tenants-in-common.

The following day, December 29, 2006, the parties recorded the following documents regarding the sale: (1) a grant deed transferring title from the landlord to Dyanlyn; (2) an assignment of lessor's interest in the lease (executed December 22, 2006); (3) an assignment and assumption of lessor's interest in the ground lease (executed December 16, 17 & 20, 2006); (4) a deed of trust and assignment of rents from Golden Westminster to Chicago Title Company and West Coast Life Insurance Company (executed December 1, 2006); and (5) an assignment of rents and leases and joinder (executed December 1, 2006).

The County of Orange (hereafter the Assessor) reassessed the property after it discovered the sale and change of ownership to Dyanlyn. For one parcel, the Assessor enrolled a value of $8,624,916, with $7,129,588 allocated to the land and $1,495,328 allocated to the improvements. For the second parcel, the Assessor enrolled a value of $6,625,267, with $4,460,457 allocated to the land and $2,164,810 allocated to the improvements.

Dyanlyn filed applications for changed assessments with the Assessment Appeals Board (the AAB). It disputed whether a reassessable change of ownership occurred when it purchased the property. Dyanlyn also disputed the enrolled values, arguing the first parcel should be valued at $6,399,000, and the second at $4,900,000.

During a two-day hearing, the AAB considered written briefs, documentary evidence, and testimony. The AAB took the matter under submission and issued a ruling on June 28, 2012. The AAB concluded, "[T]he December 2006 sale of the subject property, although subject to the long term lease of greater than 35 years, was a change of ownership. The AAB reject[ed the] Assessor's argument that the amendment [of the lease] was not in place before the sale and [found] credible the evidence on this point, including the statements within the [d]eclaration of . . . Lundin . . . ."

Lundin's declaration stated Golden Westminster constructed improvements and a shopping center on the subject property, but the rents were relatively low because of the shopping center's location. Golden Westminster was only making a very small profit. Under the terms of the purchase option formula, Golden Westminster could acquire the property for the fair market value of the land not subject to the lease or subleases, or the fair market value subject to the leases. The property owners determined the land was worth $7.1 million when not subject to the leases, which was "significantly more than the actual value of the land, encumbered as it was with the [g]round [l]ease and subleases to the tenants[.]"

Lundin explained in his declaration that Golden Westminster could not afford to exercise the option at $7.1 million, but he was "reluctant to let [the owner] take [Golden Westminster's i]mprovements plus all its right, title and interest at the end of the ground lease term" in 2037. Lundin stated the only way he could finance the acquisition "at the inflated price" was to create "an entity" that he structured by "borrowing against other properties owned by [him]self, [his] partners in [Golden] Westminster, and a new co-venturer." He declared, "However, in order to justify the investment of $7.1 million, it was necessary to extend the term of the [g]round [l]ease . . . from 2037 to 2052—an additional [15] years—we increased the period over which the entity could amortize the purchase price, thereby doubling the yield on its investment (from 1 [percent] to

2 [percent].)" Lundin added, "Although [the owners] understood that extending the [g]round [l]ease could facilitate the exercise of the buyout option under the [g]round [l]ease, it was not clear at the time the [lease] was extended that [Golden] Westminster would be able to put together a consortium to acquire the [p]roperty. [The owner] and [Golden] Westminster independently agreed to extend the [lease], which extension would be binding regardless of whether the [subject property] was purchased through the [g]round [l]ease option."

The AAB agreed with the parties that the lease extension amendment and the later sale "would each be exempt from property tax reassessment" pursuant to Revenue and Taxation Code section 62, subdivision (g), (hereafter referred to as the 62(g) exception).[2] It noted the parties conceded there was no legal authority addressing the type of transaction involved in their case. The AAB determined two tests set forth in the *Shuwa Investments Corp. v. County of Los Angeles* (1991) 1 Cal.App.4th 1635, 1648 (*Shuwa*) case were applicable. Applying these tests, the AAB explained, "It becomes clear that there was a reassessable change in ownership when the fee owner of the subject property . . . deeded the subject property to [Dyanlyn.]" And finally, the AAB agreed with Dyanlyn that the Assessor overvalued the property. It determined one property was worth $7,752,000, and the second was worth $5,848,000, for a total value of $13,600,000.

Dyanlyn decided to challenge the AAB's decision in superior court and filed a complaint seeking a refund of property taxes. It challenged the AAB's conclusion there was a reassessable change in ownership but did not seek review of the AAB's downward modification of value.

The trial court held a hearing on August 15, 2013, and took the matter under submission. On September 9, 2013, it issued a minute order in favor of the

_____

[2] All further statutory references are to the Revenue and Taxation Code, unless otherwise indicated.

Assessor. The court made the following findings: (1) Golden Westminster could not afford to exercise the option to purchase the subject property; (2) in early December 2006, Golden Westminster and the property owner extended the lease for an additional 15 years making the lease run for 45.5 years; and (3) within a few weeks after the extension, the lessee and a new investor purchased the subject property.

The trial court recognized the buyers were claiming the sale was not a change of ownership because the property was encumbered by a lease longer than 35 years (triggering 62(g) exception). The court determined the exception should not apply, stating "Golden Westminster seeks to gain in the transaction as both a purchaser and lessee of the property at issue." The court explained the legislative purpose would not be served and reasoned the exception should apply when the sale involves a third party transfer over which the lessee had no control. It noted that in this case Golden Westminster "had a direct interest in having the property sold to investors in order to preserve its right to exercise an option to purchase the property prior to the lease term ending." The court determined, "It appears that Golden Westminster orchestrated the series of transactions in order to avoid losing the property." The trial court ruled the Assessor properly reassessed the property as a result of the sale and correctly applied the "end result" test, treating the lease extension (step 1) and sale (step 2) as one transaction taken to evade reassessment. Dyanlyn appealed.

II

*A. Standard of Review*

"'It is well settled that the interpretation and application of a statutory scheme to an undisputed set of facts is a question of law [citation] which is subject to de novo review on appeal. [Citation.] Accordingly, we are not bound by the trial court's interpretation. [Citation.]' [Citation.] An appellate court is free to draw its own conclusions of law from the undisputed facts presented on appeal. [Citation.]"

6

(*McMillin-BCED/Miramar Ranch North v. County of San Diego* (1995) 31 Cal.App.4th 545, 553 (*McMillin*).)

"In *Shuwa, supra*, 1 Cal.App.4th at [page] 1644, the court stated the standard of review simply: 'What constitutes a "change in ownership" is a question of law subject to this court's independent de novo judicial review. [Citation.]' It occurs to us, however, that the application of the step transaction doctrine requires an analysis of the parties' purposes and intents in carrying out the various steps in the transaction. [Citation.] Such issues as intent and purpose are customarily viewed as factual issues. Even though there was essentially no factual dispute in this case, we find the Supreme Court's analysis of mixed questions of law and fact to be of assistance here: 'Questions of fact concern the establishment of historical or physical facts; their resolution is reviewed under the substantial[]evidence test. Questions of law relate to the selection of a rule; their resolution is reviewed independently. Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied. If the pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial[]evidence test. If, by contrast, the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently. [Citation.]' [Citation.] [¶] Here, . . . the decision of the superior court amounts to the resolution of a number of questions of law and mixed questions of law and fact that were predominantly legal in nature, rather than factual. Any factual issues raised by the declarations presented below are subordinate to the overall legal questions presented by the statutory interpretation question. We emphasize this point at some length due to our concern that there is an anomaly in the use of a pure de novo standard in this particular area of tax law. However, this de novo standard of review is well enough established for us to proceed to determine the issue anew." (*McMillin, supra,* 31 Cal.App.4th at p. 554.)

7

*B. Applicable Law—Proposition 13*

"Proposition 13, adopted in 1978, limits the amount that the assessed value of real property may be increased to reflect increases in the property's actual market value. When ownership of the property changes, however, the property may be reassessed at its current market value. [Citation.] Changing the assessed value of real property to its current market value can result in a substantial increase in the tax on that property. Thus, determining whether and when a change of ownership has occurred can have significant tax consequences." (*Auerbach v. Assessment Appeals Bd. No. 1* (2006) 39 Cal.4th 153, 157.)

"Because Proposition 13 did not explicate the meaning of 'change in ownership' [citations], it fell to the Legislature to define the phrase, a task it has striven to perform during the [many] years since Proposition 13 was adopted by the electorate. The main effort to create consistent and uniform guidelines to implement Proposition 13's undefined 'change in ownership' provision was undertaken by a 35-member panel that included legislative and board staff, county assessors[,] . . . trade associations, and lawyers in the public and private sectors. The panel's work culminated in the Report of the Task Force on Property Tax Administration (hereafter task force report), which was submitted to the Assembly Committee on Revenue and Taxation on January 22, 1979. [¶] . . . [¶] [T]he task force recommendations resulted in the enactment of the Revenue and Taxation Code provisions now before us. The Legislature adopted some of the recommendations verbatim or with nonsubstantive technical revisions, and others with rather minor changes. The report's key change-in-ownership test was adopted verbatim and is now codified as section 60, quoted hereafter. [¶] The task force report drafters stressed the need for uniformity and consistency in the application of section 60's general

rule." (*Pacific Southwest Realty Co. v. County of Los Angeles* (1991) 1 Cal.4th 155, 160-161 (*Pacific*).)[3]

Section 60 defines "'Change in ownership'" as "[A] transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest." Our analysis of the transactions in this case starts with understanding the elements of this test.

C. *Understanding Section 60's Three-Part Test*

"Section 60's governing test contains three parts . . . [and t]o determine whether the transaction in the case at bar worked a change in ownership under Proposition 13, we begin with that test." (*Pacific, supra,* 1 Cal.4th at p. 162.) A change of ownership means a transfer of (1) "a present interest in real property," (2) "including the beneficial use thereof," and (3) "the value of which is substantially equal to the value of the fee interest." (§ 60.) These three elements are commonly referred to as "present interest," "beneficial ownership," and "value equivalence."

In interpreting section 60, courts (and the Assessor) rely on the explanations set forth in the task force report. (*Pacific, supra,* 1 Cal.4th at p. 161 [citing task force report].) The report explains a "present interest" in the property is "necessary to protect a variety of contingent or inchoate transfers from unintended change of ownership treatment, including future interests, revocable transfers and transfers with retained life estates." (Task force rep., *supra,* at p. 39.) The task force determined the beneficial ownership component is "necessary to protect custodianships, guardianships, trusteeships, security interests, and other fiduciary relationships from unintended change

---

[3]      On our own motion, we take judicial notice of the Report of the Task Force on Property Tax Administration submitted to the Assembly Committee on Revenue and Taxation on January 22, 1979 (hereafter task force report).

9

in ownership treatment." (*Ibid.*) And finally, the task force included the "value equivalence" element as part of the test, finding it "necessary to determine who is the primary owner of the property at any given time." (*Ibid.*)

The task force explained, "Often two or more people have interests in a single parcel of real property. Leases are a good example. The landlord owns the reversion; the tenant, the leasehold interest. Suppose the landlord sells the property subject to the lease and the lessee assigns the lease. Which sale or transfer is the change of ownership? [¶] The example illustrates that in determining whether a change in ownership has occurred it is necessary to identify but <u>one</u> primary owner. Otherwise assessors would be forced to value, and account for separate base year values for landlords and tenants on all leases, and for other forms of split ownership. This would enormously complicate the assessor's job. [¶] A major purpose of this third element, therefore, is to avoid such unwarranted complexity by identifying the primary owner, so that only a transfer by him will be a change in ownership and when it occurs the <u>whole</u> property will be reappraised." (Task force rep., *supra,* at pp. 39-40.)

The task force added, "If the hypothetical lease previously mentioned was a short term lease (and the landlord owned the main economic value), the landlord's sale, subject to the lease would count. If, on the other hand, the lease was a long term lease (the lessee's interest was the main economic package), the lease assignment would count. In either case the entire fee value of the leased premises would be reappraised." (Task force rep., *supra,* at p. 40.) The Supreme Court, adopting this language, held a change of ownership occurs only "when the primary economic value of the land is transferred from one person to another." (*Pacific, supra,* 1 Cal.4th at p. 167.) Thus, when multiple parties have an interest in property the court must identify who is the *primary owner*.

The task force recommended specific examples (relating to common transactions) be included in the statutory scheme for assessors and taxpayers to rely on. The task force stated, "Leases are a good illustration of the necessity of concrete statutory

10

examples. Both taxpayers and assessors need a specific test—rather than the broad 'value equivalence' test—to determine the tax treatment of leases. The specific test, however, must be consistent with the 'value equivalence' rule and have a rational basis." (Task force rep., *supra,* at p. 41.)

The task force concluded the lessee of a lease lasting longer than 35 years should be deemed the primary owner of the property for property tax purposes. The task force explained, "Lenders will lend on the security of a lease for 35 years or longer. Thus, 35 years was adopted as the concrete dividing line. If the term of a lease, including options to renew, is 35 years or more, the creation of the lease is a change in ownership and so is its expiration. If a lessee under such a lease assigns or sublets for a term of 35 years or more, that is another change in ownership. However, if the lease, including options, is for less than 35 years the lessor remains the owner and only the transfer of his interest is a change. In all cases, the entire premises subject to the lease in question are reappraised." (Task force rep., *supra,* at p. 41.)

Based on the task force's recommendation, the Legislature enacted sections 61 and 62 to codify the concept that the "value equivalence" element must be determined by reference to the lease duration. Before discussing these code provisions, we note the Board of Equalization (the Board) has sought to interpret these statutes and enacted several related property tax rules, contained in title 18 of the California Administrative Code (hereafter referred to as the Rules). Thus, our discussion of the issue will include analysis of these rules. In addition, we have reviewed and refer in this opinion to "annotations" and advisory opinions published by the Board. "'Annotations' are published in either the Business Taxes Law Guide or the Property Taxes Law Guide and are summaries of the conclusions reached in selected legal rulings of counsel. Annotations do not embellish or interpret the legal rulings of counsel which they summarize and do not have the force and effect of law." (Cal. Code Regs., tit. 18, § 5700.) Our Supreme Court explained in *Yamaha Corp. of America v. State Bd. of*

11

*Equalization* (1998) 19 Cal.4th 1, 14, that the "deference due an agency interpretation—including the Board's annotations at issue here—turns on a legally informed, commonsense assessment of their contextual merit." Annotations are "not controlling upon the courts," but "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. [Citation.]" (*Ibid.*)

With the various sources of authority in mind, we will briefly outline the current "change of ownership" legal theories regarding: (1) leasehold transactions; (2) extensions of leases; and (3) the sale of property encumbered by a lease. With respect to all three types of transactions, the question of change of ownership depends on the duration of the lease. Understanding these scenarios is helpful for understanding the tax ramifications in this case, where the long-term lessee agreed to extend the lease term an additional 15 years and then purchased the property with the assistance of an outside investor. In this case, we must decide whether there is a change of ownership when property is purchased by a lessee having an original lease term of more than 35 years.

### i. Leases

Section 61, subdivision (c), provides a change of ownership occurs by the creation or termination of a leasehold interest in real property for a term of 35 years or longer. Rule 462.100, subdivision (a), contains identical language regarding long-term leaseholds. The Board and legal authority agree a change of ownership occurs because the transaction transfers to the lessee (1) a "present interest," (2) a "beneficial ownership," and (3) the "value equivalence" element. (See *Pacific, supra,* 1 Cal.4th at pp. 167-168.) In short, all three elements described in section 60 are transferred from the lessor to the lessee, who becomes the primary owner for property tax purposes.

Our Supreme Court explained, "When parties enter into a lease they create the legal relationship that governs their respective rights in the land, and either's

12

successor in interest will be bound thereby.  When the parties are sophisticated commercial entities of the type likely to sign leases for 35 or more years, such leases will often confer substantial rights on the lessee, such as the right to develop or modify capital assets, the long-term use or uses to which the land is to be put, and the like.  A long-term lease may also require the lessee to pay property taxes; indeed, the lease here imposes that duty on plaintiff.  In sum, the *primary economic value of land* encumbered by a lease of such duration rests with the lessee; the lessor's rights as a practical matter are limited to receiving rental payments under a relationship the terms of which are fixed by prior agreement for a time substantially equivalent to the duration of a fee." (*Pacific, supra,* 1 Cal.4th at pp. 167-168, italics added.)

To clarify matters, the Board created rules for when the leasehold interest is for less than 35 years.  Rule 462.100, subdivision (b)(1), provides the creation and termination of a leasehold interest having an original term *shorter than 35 years* will not result in a change of ownership.  For a short-term lease, the primary economic value of land remains with the lessor.  Thus, only two of the three section 60 elements are transferred to the lessee by the creation of a leasehold less than 35 years:  The short-term lease transfers to the lessee a "present interest," and "beneficial ownership," but not the "value equivalence."

*ii.  Lease Extensions*

Nowhere in the statutory scheme or the Rules is the topic of lease *extensions* discussed.  As noted by Dyanlyn, the Board currently believes the question of whether a lease extension triggers a change of ownership depends entirely on the duration of the original lease (not the remaining term on the lease).  The Board's Advisory Opinion (No. 09013291), dated May 27, 2009, is part of our record on appeal (hereafter Advisory Opinion).

The Board has issued several advisory opinions and property tax annotations (hereafter Annotations) on the treatment of lease extensions.  At the time of

13

Dyanlyn's transaction in 2006, there were two Annotations concluding the transaction of extending a leasehold term to over 35 years would qualify as a change in ownership (Annotation 220.0332 (July 13, 1981, December 9, 1988), and Annotation 220.0351 (December 24, 1991)), both Annotations were deleted December 2009.

In 2009, the Board revised its opinion and issued a new Annotation 220.0357 (May 27, 2009), concluding the change of ownership question for lease extensions depended on the term of the original lease: "If a leasehold was originally, or at one time, for a term of 35 years or longer, and if a reassessment had already occurred upon the lease's creation or extension to a term of 35 years or longer, the extension of the term back to 35 years or longer, when the remaining term is less than 35 years, *does not* result in a change in ownership if there were no other material changes in the terms of the lease made by the lease extension. However, if a leasehold term has at all times been under 35 years, the first extension of the leasehold term to 35 years or longer results in a change in ownership." (Italics added.)

The Board's legal department issued the Advisory Opinion regarding Annotation 220.0357, explaining why its earlier Annotations were incorrect and had been deleted. The Advisory Opinion's author, tax counsel Matthew F. Burke, explained there are potentially two different lease extension situations. The first occurs where a lease extension is made to a leasehold that has always been under 35 years. He referred to this situation as an "under/over" because the lease was originally "under" 35 years and then was extended to 35 years or longer ("over" 35 years). Burke reasoned there was no change in ownership when the lease was first created because the lessor retained the "value equivalence" component. "When the parties agree[d] to extend the leasehold term to 35 years or longer for the first time, value equivalence [was] transferred from the lessor to the lessee for the first time." Burke opined this transfer *must result in a change of ownership* because all three parts of the section 60 test are satisfied. The lessee became the owner of the leased premises for property tax purposes.

14

Burke referred to the second type of lease extension as an "over/under/over." He explained this situation arises when the lease was originally "over" 35 years, the mere passage of time dropped the lease term to "under" 35 years, and then the parties negotiate to extend the lease to once again be "over" 35 years. Burke opined this extension *would not* result in a change of ownership. "Consistent with section 60 . . . the property underwent a change of ownership when the lease was first entered into . . . [because] the lessee obtained a present interest and the beneficial use . . . [and] the value equivalence. Thus, the lessee [became] the owner of the leased premises for property tax purposes. Once the leasehold term drop[ped] below 35 years, the value equivalence shift[ed] to the lessor, however, we have consistently taken the position that . . . although the value equivalence shifts from the lessee to the lessor, there is no change in ownership. This is because the lessor does not become 'owner' of the leased premises for property tax purposes. . . . [T]he lessee remains the owner for property tax purposes . . . unless and until the lease expires or the lessor otherwise transfers its underlying fee interest in the property. [¶] If the lessor and lessee subsequently enter into a lease extension at any time while the remaining leasehold period is under 35 years, the value equivalence once again transfers to the lessee. However, the lessee has at all times retained a present interest in and the beneficial use of the property . . . . A present interest in and the beneficial use of the property were transferred to the lessee at the beginning of the lease, and have remained with the lessee at all times. Thus no change in ownership occurs. (Fn. omitted.)"

The Advisory Opinion clarified it is "crucial to recognize" that when a lease for 35 years or longer is created "the change in ownership based upon the transfer of all three elements has already been captured" and the lessee becomes the owner for property tax purposes. Burke explained "when only the value equivalence is transferred in a later extension, there has not been a correlative transfer of the present interest and beneficial use" because those elements were retained by the lessee.

15

In a footnote, Burke cautioned, "This opinion, however, may not be interpreted to suggest that a lease extension under this specific situation could be entered into with the intent of avoiding a reassessment upon a sale of the underlying fee interest in the property by the lessor. In our opinion, such a transaction would be subject to the step transaction doctrine" as discussed in the *Shuwa* case. This warning conveniently leads us to the third category of transactions involving the sale of an underlying fee interest in property encumbered by a lease.

*iii. The Sale of Property Encumbered by a Lease.*

Unlike lease extension transactions, the question of change of ownership following the sale of property encumbered by a lease appears to depend on the "remaining term" of the lease (not the original term of the lease). Section 62 lists several "exclusions" and provides a change of ownership shall not include, "Any transfer of a lessor's interest in taxable real property subject to a lease with a remaining term (including renewal options) of 35 years or more." (§ 62, subd. (g).)

This statutory exclusion was created because the task force and the Legislature recognized that a property owner selling the underlying fee interest in property encumbered by a 35-plus year lease would not be transferring to the new owner the primary economic value of the land. The lessee retains ownership for property tax purposes, having a "present interest," "beneficial ownership," and the "value equivalence" due to the lease's long duration. (See *Pacific, supra,* 1 Cal.4th at p. 168.)

The legislative intent supporting the 62(g) exception is discussed in *Pacific, supra,* 1 Cal.4th at pages 167 through 168, and *Crow Winthrop Operating Partnership v. County of Orange* (1992) 10 Cal.App.4th 1848, 1855 (*Crow Winthrop*).) "[This exception] is consonant with the concern of the task force report drafters that a transaction should not trigger reassessment unless it transfers the interest of the party carrying the primary economic weight of the property. (Task force rep., *supra,* at p. 40.) Such a determination also comports with commercial reality and

16

public expectations, both subjects of concern to the drafters of the report. (See *Id*. at pp. 38, 41, 61.) The mischief a contrary rule could create is evident: for example, a rule permitting reassessment whenever the fee changed hands in land subject to a lease with a remaining term of 35 years could result in an enormous tax increase for a lessee that has erected major capital improvements on the land and whose lease requires the lessee to pay property taxes. The increase could occur merely because the lessor has sold that interest to a third party—a transfer over which the lessee has no control." (*Pacific, supra,* 1 Cal.4th at p. 168; *Crow Winthrop, supra,* 10 Cal.App.4th at p. 1855 ["it was clear the drafters meant the term to include only those reservations in which the transferor retained the *beneficial* use of the property"].)

The Board's interpretation of the statutory exception resulted in two rules, Rule 462.100, subdivisions (a)(2)(A) and (b)(2)(A). The second rule contains similar wording as the statutory exception, stating there is no change of ownership by "[t]he transfer of the lessor's interest in real property subject to a lease with a remaining term of 35 years or more, whether to the lessee or another party." (Rule 462.100, subd. (b)(2)(A).)

We recognize the statutory exclusion (§ 62, subd. (g)) does not contain the modifying phrase "whether to the lessee or another party" as stated in Rule 462.100, subdivisions (b)(2)(A). However, the Board's expanded interpretation of the exception is correct in light of the case law and Advisory Opinion discussed above. Rule 462.100, subdivisions (b)(2)(A) properly acknowledges a long-term lessee will "capture" primary ownership of the property when the leasehold lasting more than 35 years is created. Therefore, whether the property is purchased by a third party, *or* the lessee, the property owner's transfer of the underlying fee interest cannot be deemed a change of primary ownership. The lessee retains primary ownership in either transaction.

It appears the only appreciable difference occurring when the property is purchased by the long-term lessee, as opposed to a third party, is the lessee obviously has

17

control over the sale.  We conclude this is a distinction that does not make a difference.

Our Supreme Court in *Pacific,* discussed the "mischief" that could result if it interpreted

the rules to permit reassessment whenever the fee changed hands to an outside third

party, because the lessee having "no control" over the transaction would be burdened by

an enormous tax increase.  (*Pacific, supra,* 1 Cal.4th at p. 168.)  However, the court did

not mean to suggest "lack of control" over the transaction was a necessary element for a

long-term lessee to avoid reassessment.  The court's discussion merely highlighted why it

was important to follow the task force's recommendation to avoid "unwarranted

complexity by identifying the primary owner so that only a transfer by him will be a

change in ownership . . . ."  (Task force rep., *supra*, p. 40.)  The *Pacific* court determined

that when the lessee is the primary owner for property tax purposes, a sale of the

underlying fee interest in the property will not trigger reassessment because there has

been no change of ownership.  (*Pacific, supra,* 1 Cal.4th at p. 168.)

　　　　　The Board's first rule, Rule 462.100, subdivision (a)(2)(A), appears to be a

mirror image counterpart to the second rule.  It provides a change of ownership occurs by

"The transfer of a lessor's interest in taxable real property subject to a lease with a

remaining term of *less than* 35 years."  (Rule 462.100, subd. (a)(2)(A), italics added.)

We find this rule is problematic because it is not in sync with the case authority or the

Advisory Opinion.  As we will explain below, Rule 462.100, subdivision (a)(2)(A ), fails

to recognize the distinction between a long-term lessee having a primary ownership from

a third party who does not.[4]  We are not bound to follow administrative rules, and for

purposes of this appeal, we will not.

---

[4]　　　　　The Board should consider adding a modifying phrase to accommodate
situations where the lessee is the primary owner and purchases the property encumbered
by a lease that was originally 35 years or more.

*iv. Rule 462.100, subdivisions (a)(2)(A)*

We found no case authority supporting Rule 462.100(a)(2)(A). And in light of Burke's detailed and persuasive Advisory Opinion, we conclude the rule as stated would not apply in "over, under" lease situation when there is a transfer of a lessor's interest in taxable real property to the long-term lessee, when the original term of the lease was "over" 35 years. It is only through the passage of time that the remaining lease term dropped "under" 35 years. We agree with the Board's "consistent position" that "although the value equivalence shifts from the lessee to the lessor [by the passage of time], there is no change in ownership. This is because the lessor does not become the 'owner' of the leased premises for property tax purposes. [T]he lessee remains the owner . . . ." (Fn. omitted.)

To summarize, in the context of lease extension transactions, the Assessor should not consider the passage of time as transferring primary ownership to the lessor. The lessee is deemed to have retained primary ownership for property tax purposes despite having a remaining term of less than 35 years. We find no logical reason why this same rule should not apply in the context of a purchase transaction by a long-term lessee. The section 60 test would be applied the same way: The lessee captured all three section 60 elements when the long-term lease was first created. Whether the lessee extends the lease or acquires the underlying fee interest, the lessee remains the primary economic owner before and after the transactions. "The lessee has at all times retained a present interest in and the beneficial use of the property . . . . Thus, no change in ownership occurs."

*C. Analysis*

In the case before us, there are two transactions at issue. In the first transaction the property owner and Golden Westminster agreed to extend the lease by

19

15 years (creating a remaining term of 45.5 years). Under the Board's current Annotation regarding lease extensions, this "over, under, over" scenario would not result in a change of ownership because the original lease was for a term exceeding 35 years.

In the second transaction, the owner of the subject property sold its fee interest to Dyanlyn. Pursuant to the 62(g) exception, the sale would not be ordinarily considered a change of ownership because the property was encumbered by a long-term lease.

Thus, neither transaction standing alone was a change of ownership triggering reassessment. However, the Assessor determined the two transactions viewed together were suspect because (1) two-thirds of Dyanlyn's partnership was comprised of long-term lessees and they could have manipulated the lease to unfairly take advantage of the 62(g) exception, and (2) when the transaction took place back in 2006, the Assessor was operating under now-deleted Annotations holding the lease extension past 35 years would trigger reassessment.

The sole question we must decide de novo on appeal is whether the two transactions, viewed together, were a sham to avoid reassessment of property taxes. As we will explain, the answer is no.

### i. Step Transaction Doctrine

The Assessor reassessed the property on the theory the property owner and Dyanlyn took multiple steps to avoid triggering reassessment. The Assessor decided step one was an extension of the lease to a term beyond 35 years, and step two was the sale of property encumbered by a long-term lease, falling under the 62(g) exception to change of ownership. The bulk of the briefing in this case is devoted to whether the exception should be overridden in this case pursuant to the step transaction doctrine. (See *Shuwa, supra,* 1 Cal.4th at pp. 1648-1649.)

"In a case such as this, where the propriety and necessity for multiphase transactions is challenged, the 'step transaction doctrine' has been applied to determine

20

whether the transaction should be treated as a whole or whether each step of the transaction may stand alone.  The 'step transaction doctrine' is a corollary of the general tax principle the incidence of taxation depends upon the substance of a transaction rather than its form.  [Citation.]  Although the concept is not entirely alien to California jurisprudence, the doctrine was developed and is primarily utilized in the federal courts.  [Citations.]" (*Shuwa, supra*, 1 Cal.App.4th at pp. 1648-1649.)

"In *Shuwa, supra*, . . . the court set forth the history of the step transaction doctrine as a 'corollary of the general tax principle the incidence of taxation depends upon the substance of a transaction rather than its form.  [Citation.]'  [Citation.]  Three basic tests have been developed for application of the step doctrine:  (1) the 'end result test,' in which purportedly separate transactions 'will be amalgamated with a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result . . . [citations]' [citation]; (2) the 'interdependence test,' requiring an evaluation of '"whether on a reasonable interpretation of objective facts the steps [are] so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series . . ." [citations]' [citation] (in other words, the analysis is of the relationship between the steps and asks whether one step would have been taken without any of the others [citation]; and (3) the 'binding commitment test,' requiring that if one transaction is characterized as a first step, there must be a binding commitment to take later steps.  [Citation.]  The court in *Shuwa* applied all three of the tests and found they were all satisfied by those facts.  The court did not comment on whether the use of the tests may be made in the alternative and whether satisfaction of less than all tests is enough to find a step transaction exists." (*McMillin, supra,* 31 Cal.App.4th at pp. 554-556.)

The *McMillin* court, relying on federal authority, determined only one test need be satisfied.  (*McMillin, supra,* 31 Cal.App.4th at p. 556.)  The court in *King Enterprises, Inc. v. United States* (Ct.Cl. 1969) 418 F.2d 511, 517, held that although

21

there are real differences between the step transaction tests, "each is faithful to the central purpose of the step transaction doctrine; that is, to assure that tax consequences turn on the substance of a transaction rather than on its form."

If the long-term lessee (Golden Westminster) had *alone* purchased the property, this case would be much simpler. There was no change of ownership by either the lease extension (step 1) or the purchase (step 2) when viewed together or apart. A lessee captures all three section 60 elements by creation of a lease lasting more than 35 years. Thus, the partners of Golden Westminster became primary owners for property tax purposes when the lease was created in the 1970s. Regardless of whether the lease was extended, the lessor's transfer of its remaining fee interest in the property to the long-term lessees would not be deemed a transfer of primary ownership for property tax purposes. The passage of time does not serve to defeat the lessee's role of primary owner. Thus, because both step 1 and step 2 would not serve to avoid reassessment with respect to the lessee (Golden Westminster), there would be no rational basis to apply the step transaction doctrine (if the lessee alone purchased the property).

Likewise, if the new investor, Sechelt, had alone purchased the property from the owner there would be no change in ownership issue. Simply stated, Sechelt purchased the lessor's interest in property encumbered by a lease lasting more than 35 years. This transaction falls squarely within the 62(g) exception. Moreover, as to Sechelt, the record supports the conclusion it was involved in only one step, i.e., the purchase. It was undisputed Sechelt was not a party to the pre-existing leasehold between the lessee and lessor. Sechelt could not control the leasehold and played no role in extending the lease. The evidence showed Golden Westminster did not have a particular entity in mind when it extended the lease to make the property more attractive to outside investors. The step transaction doctrine applies to transactions involving multiple steps, not just one, as would be the case if Sechelt was the sole purchaser.

22

We appreciate the Assessor believed the transaction in this case was suspicious because the entity purchasing the property was a consortium of an existing long-term lessee and a new investor. Golden Westminster, unable to afford the property on its own, admitted the lease was extended, in part, to attract an outside investor. And Sechelt clearly benefitted from becoming partners with long-term lessees because it could ride on the coattails of those already possessing "ownership" for property tax purposes. Unlike the Assessor, however, we do not consider the business deal to be a scam to avoid reassessment. Applying the step transaction doctrine, we conclude the unusual partnership arrangement does not justify overriding application of sections 60 and 62 (particularly when there would be no reassessment if the property was purchased by only the parties owning a majority share (75 percent)).

We turn first to the end result test. This test requires evidence steps 1 and 2 were really component parts of a single transaction intended from the beginning to reach the end result of avoiding reassessment of property taxes. The end result test is not satisfied unless there is evidence *all the parties* shared the same ultimate goal. "The end result test and the binding commitment test both appear to require the same parties to have been pursuing a related intent throughout the steps of the transaction. [Citation.]" (*McMillin, supra*, 31 Cal.App.4th at p. 559.) There is no evidence Sechelt participated in or encouraged the lease extension. To the contrary, the lease was lengthened to attract any new investor, not specifically Sechelt.[5] Because it cannot be said all the parties in the transactions shared the same goal "from the beginning," the end result test is inapplicable.

---

[5] The Assessor focuses on the close timing between the two steps as proof Sechelt was involved early on in the transaction and suspicious activity. The Assessor has confused proof with speculation. While timing is a factor to be considered, it must relate to whether the transactions in question signify a related intent among the participating parties.

23

The interdependence test also does not apply.  The "interdependence" test looks to whether the actions are "'so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series.'  [Citations.]" (*Shuwa, supra,* 1 Cal.App.4th at p. 1651.)  The Assessor argues, "Clearly all of the transactions which took place in December 2006 were done for the ultimate purpose and goal of allowing . . . the tenant/lessee to exercise its option to buy-out the ground lease, which is, in fact, what ultimately happened."  It concludes the steps were interdependent because standing alone they would not have the same legal effect of facilitating a buy out.

This argument misstates the test.  Each step must be evaluated to determine if it had an independent meaning or if it would have been fruitless without completion of the other steps.  In cases such as *Crow Winthrop,* there was clear evidence one step of the transaction had no purpose other than to avoid reassessment.  That case involved a sale of the property and then a lease back to the seller.  (*Crow Winthrop, supra*, 10 Cal.App.4th at p. 1856.)  The court reasoned, "The leases had no independent meaning—they were clearly the determinative factor in completing the sale . . . without incurring a reassessment of this extremely valuable piece of property."  (*Id.* at p. 1858.)  The prior owner had been operating without the necessity of setting up leases, and the leases were not consummated until all other aspects of the sale were completed.  The court determined the lease back arrangement was created solely to sidestep reassessment of the property.

Similarly, in the *Shuwa* case, the court determined the two sellers and single buyer of a property devised an elaborate three-step process to achieve only one purpose, Shuwa Investment Corporation's (Shuwa's) acquisition of ARCO Plaza.  The two sellers were partners.  One partner sold Shuwa its 50 percent partnership interest, the partnership was then liquidated and each received a 50 percent interest distribution in the ARCO Plaza.  Shuwa then purchased its former partner's interest in the property.  "Shuwa wanted the entire Plaza; a one-half interest through the partnership did not

24

accomplish its purpose and was but a means to buy the remaining interest held by Bank of America. And that latter purchase 'was only necessitated by the existence of the prior two steps to effectuate Shuwa's desire for all of the property.' [Citation.] Thus, 'each individual step would have been useless without a completion of the series . . . .' [Citation.]" (*Crow, supra,* 10 Cal.App.4th at p. 1857.) The court refused to "adopt the subterfuge" and determined the transaction must be treated as a whole.

In the case before us, there was evidence step one, the lease extension, had independent economic substance. The lessee desired an additional 15 years to utilize its buildings and improvements on the property, to collect rent, and improve its profit margin. The transaction served a valid purpose unrelated to the goal of acquisition and was not a fruitless act. Indeed, the lessee bound themselves to the terms of the new lease regardless of whether they could later utilize the buy-out provision. It is undisputed the ground lease is still valid under the new ownership. Accordingly, we do not find the two steps interdependent because the lease extension (step one) would have been taken by the lessee without the second step (in the event they had not found an outside investor).

The final test, the binding commitment test, was not utilized by the Board or trial court. We agree it does not apply because this case does not involve a series of transactions spanning several years. (*Associated Wholesale Grocers, Inc. v. U.S.* (10th Cir. 1991) 927 F.2d 1517, 1522-1523, fn. 6 [binding commitment test seldom applied].) It rejected the "taxpayer's claim that 'the step transaction doctrine is inapplicable where, . . . there are valid business reasons for the intermediate steps.'" (*Id.* at p. 1526.)

D. *Assessor's Arguments*

In its respondent's brief, the Assessor discusses why the sale of a fee interest is generally considered a change of ownership unless an exclusion applies. It recognizes the 62(g) exception would apply but argues the Legislature did not intend for the exclusion to apply in this case, i.e., when the sale is to a long-term lessee having "control" over the sale transaction. Its reliance on the *Pacific* case to support this

contention is misplaced. The *Pacific* court described the legislative intent to designate one primary owner for property tax purposes. (*Pacific, supra,* 1 Cal.4th at p. 168.) It determined that when a lessor sells property encumbered by a long-term lease, the lessee possesses primary ownership and there is no change in ownership. To support this rule, the court recognized reassessing property taxes every time the fee interest was sold to a third party would be unfair to the party possessing the primary ownership interest because he or she lacks control over the sale. As we explained earlier in this opinion, the court did not conclude the Legislature intended a different change of ownership test focused on whether the primary owner lacked or held control over the transaction. The court merely highlighted the unfairness to be avoided by reassessing property when the primary ownership interest has not been transferred by the transaction. This argument is just one example of several in which it appears the Assessor is attempting to stretch the rules to preclude a long-term lessee from entering into legitimate multi-party transactions for fear of being reassessed. Using the statutory exception is not automatically suspect behavior.

### III

The judgment is reversed. The matter is remanded to the trial court with directions to enter judgment for Dyanlyn. Appellants shall recover their costs on appeal.


O'LEARY, P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.

26

Filed 2/23/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DYANLYN TWO et al.,<br><br>    Plaintiffs and Appellants,<br><br>        v.<br><br>COUNTY OF ORANGE,<br><br>    Defendant and Respondent. | G049269<br><br>(Super. Ct. No. 30-2012-00618968)<br><br>O R D E R |

The Law Offices of Ajalat, Polley, Ayoob & Matarese have requested that our opinion filed January 30, 2015, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

The opinion is ordered published in the Official Reports.


                                                            O'LEARY, P. J.
WE CONCUR:


FYBEL, J.


IKOLA, J.